Justice PARRISH,
opinion of the Court:
INTRODUCTION
€1 This case requires us to determine whether an attorney-client relationship that existed between the United Effort Plan Trust (UEP Trust or Trust) and its attorneys at the law firm Snow, Christensen & Marti-neau (SCM) continued after the Trust was reformed cy pres[1] Specifically, we must determine whether the district court's reformation of the UEP Trust altered the Trust to such an extent that it can no longer be considered the same client for purposes of the attorney-client privilege and rule 1.9 of the Utah Rules of Professional Conduct. The district court determined that reformation of the UEP Trust did not sever the attorney-client relationship and it therefore ordered SCM to disgorge privileged attorney-client information to the reformed UEP Trust (Reformed Trust). Additionally, it disqualified SCM under rule 1.9 of the Utah Rules of Professional Conduct from representing clients Willie Jessop, Dan Johnson, and Merlin Jessop (Movants) in substantially related matters in which the Movants' interests were materially adverse to the Reformed Trust.
12 We hold that the UEP and the Reformed Trust were not the same client. Therefore, there was no attorney-client relationship between SCM and the Reformed Trust. As a result, the district court erred when it disqualified SCM from representing Movants and ordered SCM to disgorge privileged attorney-client information to the Special Fiduciary of the Reformed Trust.
BACKGROUND
13 The UEP Trust was created in 1942 by the predecessors of a religious group known as the Fundamentalist Church of Jesus Christ of Latter-Day Saints (FLDS Church). The UEP Trust's stated purpose was primarily "charitable and philanthropic." Membership in the UEP Trust was established by "consecrating" property to the Trust "in such amounts as shall be deemed sufficient by the Board of Trustees."
T 4 In 1987, the Trustees of the UEP Trust were sued by Trust land residents. The suit alleged several causes of action, including a claim for breach of fiduciary duty. The district court dismissed these claims because it found that the UEP Trust was charitable and the plaintiffs therefore lacked standing. But in Jeffs v. Stubbs, we reversed the district court's decision and held that the UEP Trust *1062 was not charitable because it benefitted specific individuals 970 P.2d 1234, 1252-53 (Utah 1998). In response to our decision, the sole surviving beneficiary of the UEP Trust, Rulon Jeffs, acting for himself and as the president of the Corporation of the FLDS Church, and other trustees amended and reinstated the UEP Trust. It is undisputed that the amended UEP Trust is a charitable trust. Unlike the original trust documents, which essentially limited the class of beneficiaries to the UEP Trust founders, the 1998 restatement substantially broadened the class of beneficiaries to include FLDS Church members who "consecrate their lives, times, talents, and resources to the building and establishment of the Kingdom of God on Earth under the direction of the President of the [FLDS] Church."
5 The primary purpose of the UEP Trust was religious. The 1998 UEP Trust's declaration expressly states that it "is a religious and charitable trust," and "a spiritual ... step toward[s] living the Holy United Order." The Trust further provides that the Holy United Order is a "central principle of the Church" that "requires the gathering together of faithful Church members on consecrated and sacred lands to establish as one pure people the Kingdom of God on Earth under the guidance of Priesthood leadership."
16 "[Clonsistent with its religious purpose," the UEP Trust states that it is to be administered "to provide for Church members according to their wants and their needs, insofar as their wants are just (Doctrine and Covenants, Section 82:17-21)." The UEP Trust makes clear that participation in the Trust is conditioned on living in accordance with the principles of the United Effort Plan and the FLDS Church as determined by spiritual leaders. It provides that
[plarticipants who, in the opinion of the Presidency of the Church, do not honor their commitments to live their lives according to the principles of the United Effort Plan and the Church shall remove themselves from the Trust property and, if they do not, the Board of Trustees may ... cause their removal.
The UEP Trust was "intended to be ... of perpetual duration; however in the event of [its] termination, ... the assets of the Trust Estate at the time [were tol become the property of the Corporation of the President of the [FLDS] Church, corporation sole."
T7 In 2004, the UEP Trust and then FLDS president, Warren Jeffs, were sued in two separate tort actions. Rodney Parker, an attorney from the law firm of SCM entered an appearance as counsel for the UEP Trust and the FLDS Church in both of these actions but later withdrew when he was discharged by his clients. Because the controlling trustee, Warren Jeffs, did not appoint substitute counsel in either action, the UEP Trust was vulnerable to having default judgments entered against it The Utah Attorney General (AG) responded by petitioning the district court for: (1) removal of the trustees for breach of fiduciary duty; (2) an order that the trustees provide an inventory, final report, and accounting of Trust assets; and (8) an appointment of a Special Fiduciary to administer the Trust until a new trustee was appointed.
T 8 In June 2005, the district court entered an order for a preliminary injunction suspending the trustees of the UEP Trust and appointing Bruce Wisan as special fiduciary "on a limited basis" to manage the affairs of the Trust. Additionally, the court asked the Special Fiduciary to identify any issues that the court needed to address before it appointed new trustees. In response to the court's request, the Special Fiduciary indicated that the Trust would need to be reformed before new trustees could be appointed.
T9 On December 18, 2005, the district court issued an order that the UEP Trust be reformed. Using the doctrine of cy pres, the district court found that the UEP Trust had two primary purposes. It concluded that its first purpose was to advance the religious doctrines and goals of the FLDS Church and that its second purpose was to provide for the "just wants and needs" of FLDS Church members. The district court held that although the trust could not be reformed to advance its religious purposes, it could be reformed to advance its charitable purpose to *1063 provide for UEP Trust beneficiaries' "Just wants and needs.[2]
{10 Using secular principles, the district court reformed the UEP Trust. The purpose and provisions of the Reformed Trust are vastly different from those of the UEP Trust. The UEP Trust existed solely for the purpose of "preserv[ing] and advaneling] the religious doctrines and goals of the [FLDS Church]." In contrast, the Reformed Trust is "separate and distinct from ... the FLDS Church, as well as other religious efforts, objectives, doctrines or organizations." Additionally, the Reformed Trust was to be administered "based on neutral principles of law," independent of Priesthood input. But Priesthood input was critical to the administration of the UEP Trust. Indeed "[the doctrine and laws of the Priesthood ... [were] the guiding tenants by which the Trustees of the [UEP] Trust" were to act. The beneficiaries of the Reformed Trust were also different from those of the UEP Trust. While participation in the UEP Trust was limited to FLDS Church members, beneficiaries of the Reformed Trust included nonmembers "who [could] demonstrate that they had previously made contributions to either the [UEP] Trust or the FLDS Church."
1 11 Petitioners argue that the administration of the Reformed Trust differs vastly from that of the UEP Trust. Unlike the UEP Trust, which was administered in a manner that advanced the FLDS Church and its members, petitioners contend that the Reformed Trust is administered in a manner that is hostile towards the FLDS Church and its members. To support their argument, they point to the Special Fiduciary's attorney's characterization of the administration of the trust as "sociological and psychological war with the beneficiaries." They also point to the Special Fiduciary's court filings, which refer to church members and the former Trustees of the UEP Trust, including the president of the FLDS Church, as "saboteurs" and "conspirators." Petitioners also note that the Special Fiduciary has admitted that a factor in determining whether Trust property will be conveyed to beneficiaries outright or subject to a spendthrift trust is whether the transferee is likely to participate in the United Holy Order. Petitioners claim that this practice discriminates against beneficiaries who practice the doctrines of the FLDS Church.
[ 12 Petitioners are particularly critical of the Special Fiduciary's attempt to sell the Harker Dairy Operation (Berry Knoll Farm). Petitioners take offense to the sale because they view the Berry Knoll Farm as having historic and religious value. They claim that the Berry Knoll Farm is sacred because it was revealed to FLDS Church leadership by divine inspiration that the property was to be the site for an FLDS temple. Despite these protests, the Special Fiduciary claims that he must sell Berry Knoll Farm to meet the Reformed Trust's cash flow problems.
1 13 In response to concerns over administration of the Trust, an association of members of the FLDS Church (Association) filed a petition for an extraordinary writ, which challenged the validity of the Reformed Trust on several grounds. In Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Lindberg, we concluded that because the Association's petition was filed three years after the district court's reformation of the UEP Trust, all but one of the Association's clams were barred by the doe-trine of laches. 2010 UT 51, T1, 238 P.3d 1054. We further concluded that the remaining claim that was not barred by laches was not ripe for adjudication. Id. We therefore held that the district court's reformation of the UEP Trust was final and could not be challenged. Id. 135.
1 14 On May 19, 2008, the Special Fiduciary served subpoenas on SCM seeking doeu-ments related to SCM's former representa *1064 tion of the UEP Trust. SCM objected, claiming that the requested documents contained privileged attorney-client information. SCM argued that the Special Fiduciary was not entitled to these documents because the Reformed Trust was not the same entity as the UEP Trust and because the Special Fiduciary and the Reformed Trust were, in fact, adversaries of the former UEP Trustees and the settlor of the UEP Trust. On June 26, 2008, the Special Fiduciary filed a motion to compel compliance with the subpoenas, and the district court granted the Special Fiduciary's motion.
15 On August 14, 2008, Movants learned of the Special Fiduciary's intent to sell the Berry Knoll Farm and hired SCM to represent them in their efforts to prevent the sale. On August 25, 2008, the Special Fiduciary moved to disqualify SCM under rule 1.9 of the Utah Rules of Professional Conduct. The Special Fiduciary argued that because SCM had formerly represented the UEP Trust and because the Reformed Trust and the UEP Trust were the same entity, SCM was prohibited from representing Movants in any matter in which they were materially adverse to the Reformed Trust. SCM opposed the Special Fiduciary's motion. First, it argued that trusts are not capable of forming attorney-client relationships and therefore it never established a relationship with the Reformed Trust. Second, it argued that, even if it were possible to form an attorney-client relationship with a trust, the Reformed Trust is not the same entity as the UEP Trust. It therefore argued that it neither represented the Reformed Trust nor established an attorney-client relationship with that entity.
1 16 The district court rejected SCM's arguments and disqualified SCM from representing Movants. Because SCM and Mov-ants were not parties to the proceedings, they had no right to appeal. They therefore petitioned this court for a writ of extraordinary relief under rule 65B of the Utah Rules of Civil Procedure. We have jurisdiction pursuant to Utah Code section 78A-3-102(2).
STANDARD OF REVIEW
117 Rule 65B of the Utah Rules of Civil Procedure governs petitions for extraordinary relief. It provides that "[wlhere no other plain, speedy and adequate remedy is available ... relief may be granted ... where an inferior court ... has exceeded its jurisdiction or abused its discretion." Urax R. Cv. P. 65B(a), (d)(2). A district court's mistake of law "may constitute an abuse of [its] discretion." State v. Barrett, 2005 UT 88, ¶ 26, 127 P.3d 682; see also State v. Henriod, 2006 UT 11, ¶ 19, 131 P.3d 232.
118 Petitioners argue that the district court abused its discretion when it ordered SCM to disclose privileged attorney client information to the Reformed Trust and when it disqualified SCM from representing the Movants. The existence of a privilege is a question of law that we review for correctness. Burns v. Boyden, 2006 UT 14, ¶ 6, 133 P.3d 370. "[The proper standard of review for decisions relating to disqualification is abuse of discretion." Cheves v. Williams, 1999 UT 86, ¶ 57, 993 P.2d 191 (internal quotation marks omitted). "However, to the extent this [clourt has a special interest in administering the law governing attorney ethical rules, a trial court's discretion is limited." Id. (internal quotation marks omitted).
ANALYSIS
T19 This case raises three issues: (1) whether a petition for extraordinary relief is an appropriate mechanism for challenging the district court's order disqualifying SCM and compelling it to disclose privileged attorney-client information to the Special Fiduciary of the Reformed Trust, (2) whether SCM is required to disclose attorney-client information to the Special Fiduciary, and (8) whether SCM can represent clients whose interests are materially adverse to the interests of the Reformed Trust. We address each of these issues in turn.
I. THE PETITION FOR EXTRAORDINARY RELIEF IS AN APPROPRIATE PROCEDURE TO CHALLENGE THE DISTRICT COURTS ORDER
T20 Judge Lindberg argues that a writ for extraordinary relief is not the appropriate procedural mechanism for challenging *1065 the district court's ruling. Specifically, she argues that this case does not involve extraordinary cireumstances. We disagree.
121 Rule 65B of the Utah Rules of Civil Procedure provides that "[wlhere no other plain, speedy and adequate remedy is available, a person may petition the court for extraordinary relief on ... grounds ... involving the wrongful use of judicial authority" Utax R. Civ. Proc. 65B(a). A court wrongfully uses its judicial authority when it abuses its discretion. Urax R. Civ. Proc. 65B(d)(2)(A). "IIIf a petitioner is able to establish that a lower court abused its diseretion, that petitioner becomes eligible for, but not entitled to, extraordinary relief." State v. Barrett, 2005 UT 88, ¶ 24, 127 P.3d 682.
122 The question of whether to grant a petition for extraordinary relief lies within the sound discretion of this court. Id. When considering whether to grant a petition, we may consider a variety of factors such as "the egregiousness of the alleged error, the significance of the legal issue presented by the petition, the severity of the consequences occasioned by the alleged error, and additional factors." Id. 124. But these factors are neither controlling nor do they wholly measure the extent of our discretion. Id.
11 23 We conclude that SCM and Movants appropriately utilized a petition for extraordinary writ in challenging the district court's order. As nonparties to the district court proceeding, SCM and Movants had "no other plain, speedy and adequate remedy ... available" to challenge the district court's order. Moreover, the consequences of the district court's error-disgorgement of documents allegedly protected by attorney-client privilege and disqualification of counsel-are of sufficient severity to justify the writ.
124 Because SCM and Movants were not parties to the proceeding below, they cannot appeal the district court's order. Thus, outside of the extraordinary writ process, they have no "plain, speedy, and adequate remedy" to challenge it. As we have previously indicated, when an individual who is not a party to a district court proceeding is adversely affected by an order or judgment, the procedural mechanism for challenging the district court's action is through a petition for extraordinary writ. See Soc'y of Prof'l Journalists v. Bullock, 743 P.2d 1166, 1168, 1171 (Utah 1987).[3]
25 Second, an extraordinary writ is appropriate in this case because compelling SCM to turn over what is alleged to constitute privileged information has the potential to result in irreparable injury. "[Alppellate courts cannot always unring the bell once the information has been released." United States v. Sciarra, 851 F.2d 621, 636 (8d Cir. 1988) (internal quotation marks omitted); see also In re Perrigo Co., 128 F.3d 430, 437 (6th Cir.1997) ("[Floreed disclosure of privileged material may bring about irreparable harm.").
126 Finally, the order disqualifying SCM will result in irreparable injury to the Mov-ants because it will separate them "from the counsel of [their] choice with immediate and measurable effect." Zurich Ins. Co. v. Knotts, 52 S.W.3d 555, 560 (Ky.2001); seg, e.g., AlliedSignal Recovery Trust v. Allied-Signal, Inc., 934 So.2d 675, 681 (Fla.Dist.Ct.App.2006). And in this case, SCM is not only the Movants' counsel of choice, but is uniquely situated to represent the Movants because it has knowledge of the cireumstances surrounding the creation of the UEP Trust, the trust documents, and the trust reformation. Because SCM and the Movants cannot appeal the district court's order and because any error could result in irreparable harm to *1066 petitioners, we conclude that a petition for extraordinary relief was the correct procedure for challenging the district court's order. We now turn to the question of whether SCM and Movants are entitled to the relief they seek.
II THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT DETERMINED THAT SCM HAD AN ATTORNEY-CLIENT RELATIONSHIP WITH THE REFORMED TRUST
127 We next address whether the district court abused its discretion when it ordered SCM to disgorge privileged attorney-client information to the Special Fiduciary. SCM argues that the district court abused its discretion because "charitable trusts are not entities capable of entering into an attorney-client relationship or holding a privilege." It therefore reasons that the only attorney client relationship created by SCM's prior representation of the UEP Trust was between SCM and the former trustees and not between SCM and the UEP Trust itself. Alternatively, SCM argues that even if an attorney-client relationship existed between SCM and the UEP Trust, the Reformed Trust is not the same client as the UEP Trust. Therefore, SCM cannot be disqualified from representing the Movants based on its former relationship with the UEP Trust.
128 We hold that the UEP Trust was an entity that was capable of forming an attorney-client relationship. Nevertheless, we hold that the Reformed Trust and the UEP Trust are not the same entity for purposes of analyzing the attorney-client relationship. We therefore conclude that the district court abused its discretion when it ordered SCM to disgorge privileged information to the Special Fiduciary and when it disqualified SCM from representing Movants.
A. The UEP Trust Was an Entity Capable of Entering Into an Attorney-Client Relationship
129 We first consider whether the UEP Trust was a client of SCM. SCM argues that the UEP Trust was never its client because a charitable trust is merely a fiduciary relationship and is not an entity capable of being a "client" for purposes of asserting an attorney-client privilege. SCM argues that it established an attorney-client relationship with the trustees of the UEP Trust and not the UEP Trust itself. It therefore reasons that when the district court reformed the UEP Trust and removed its trustees, SCM was entitled to continue its attorney-client relationship with the former trustees,. We disagree.
1830 The attorney-client privilege is defined by rule 504 of the Utah Rules of Evidence. "When interpreting [our rules of evidence], we use general rules of statutory construction." Clark v. Archer, 2010 UT 57, ¶ 9, 242 P.3d 758. "[Wle consider the literal meaning of each term and avoid interpretations that will render portions of a [rule] superfluous or inoperative." Hoyer v. State, 2009 UT 38, ¶ 22, 212 P.3d 547. "If a rule's language is clear and unambiguous, analysis of the rule's meaning ends." Clark, 2010 UT 57, ¶ 9, 242 P.3d 758. We therefore begin with the plain language of rule 504.
131 Rule 504 provides that an attorney's "client has a privilege to refuse to disclose and to prevent any other person from disclosing, confidential communications made for the purpose of facilitating the rendition of professional legal services." UTax R. Evip. 504(b)(1). The rule defines client as "a person[,] ... corporation, association, or other organization or entity ... who is rendered professional legal services by a lawyer." Id. 504(a)(1). The rule further provides that "(tlhe [attorney-client] privilege may be claimed by ... the successor, trustee, or similar representative of a client that was a corporation, association, or other organization, whether or not in existence." Id. 504(c)(4).
" 32 For purposes of rule 504, a trust is an entity not unlike a corporation. Under the plain language of the rule, a trustee can claim the privilege on behalf of the entity that it represents just as a representative of a corporation can assert the privilege on behalf of the corporation. Interpreting rule 504 as stating that a trust could not hold the privilege is simply inconsistent with the language of provision (c), which specifies who *1067 can claim the privilege on behalf of an entity or organization. Under the plain language of rule 504, it is the trust that holds the actual privilege and the trustee who claims the privilege on behalf of the trust.
133 Having determined that the UEP Trust is capable of forming an attorney-client relationship and thereby holding the attorney-client privilege, we next address whether the privilege continued from the original UEP Trust to the Reformed Trust. We conclude that the district court's reformation of the UEP Trust so significantly altered it that the UEP Trust was transformed into an entirely different entity. In other words, we conclude that the UEP Trust and the Reformed Trust are not the same client.
B. The UEP Trust and the Reformed Trust Are not the Same Entity
184 To determine whether the UEP Trust and the Reformed Trust are the same client for purposes of the attorney-client privilege, we begin by examining the Trust's reformation. The district court reformed the trust using the doctrine of cy pres. When the purposes of a charitable trust "become[ ] unlawful, impracticable, impossible to achieve, or wasteful," a "court may apply cy pres to [either] modify or terminate the trust by directing that the trust property be applied ... in a manner consistent with the settlor's charitable purposes." Urax Cop® § 75-7-418(1).
Cy pres is a doctrine that is sometimes invoked when there has been a gift or bequest for a charitable purpose, which for some reason cannot be literally carried out, and something closely analogous is done which comports with and fulfills what appears to be the donor's intention and purpose.
In re Gerber, 652 P.2d 937, 940 (Utah 1982) (emphasis omitted) (internal quotation marks omitted).
$385 When employing the doctrine of cy pres, the donor's intention "should be the aim of the court." Id. (internal quotation marks omitted). The idea underlying the doctrine is that the donor may have a general charitable intent, and that the particular charitable institution is only an agent for effectuating that intent. Therefore, if it becomes impossible or illegal to effectuate the gift in the precise manner specified by the donor, the court may look for another agent that is of the same character as the one specified and that will effectuate the settlor's general charitable intent. Id. at 987-40. Essential to the application of cy pres is the requirement that the court determine what "the settlor would have wanted to happen if he were aware of the contingency which has made the exact effectuation of his expressed intent impossible." Howard Sav. Inst. of Newark, N.J. v. Peep, 34 N.J. 494, 170 A.2d 39, 43 (1961). Thus, application of the cy pres doctrine requires a court to determine whether the settlor would have chosen the district court's modifications over a simple termination of the trust.
186 Although we previously upheld the reformation of the Trust in Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Lindberg, we did so exclusively on the basis of laches. 2010 UT 51, 35, 238 P.3d 1054. We did not evaluate whether the reformation was consistent with the principle or requirements of cy pres in that the Reformed Trust was of the same character as the UEP Trust or that the Reformed Trust was consistent with the settlor's intent.
137 In determining the settlor's intent, a court considering reformation under the doctrine of cy pres looks first to the plain language of the trust. Makoff v. Makoff, 528 P.2d 797, 798 (Utah 1974). If the settlor's intent is clear from the language of the trust, parol evidence is inadmissible to vary the terms of the instrument. Id. "However, in ascertaining the intention of the settlor{, the court] may consider the entire instrument aided by the surrounding cireumstances existing at the time of creation of the trust." Id.
[ 38 In this case, the plain language of the Trust makes clear that advancement of the FLDS religion was an essential purpose of the Trust. This religious purpose permeates all aspects of the Trust, starting with the manner in which Trust assets were acquired. Trust assets were acquired through the "consecration" of property by FLDS members. *1068 The Trust described "consecration" as "an unconditional dedication to a sacred purpose." The Trust's religious purpose also was reflected in the manner in which trustees were appointed. Trustees were appointed by the President of the FLDS Church and the President of the Church was to serve as "a trustee and President of the Board of Trustees."
T39 In addition, Trust distributions were judged by religious standards. Whether beneficiaries were entitled to benefit from Trust property was evaluated based on their righteousness. Specifically,
[those who [sought] the privilege to ... live upon the lands and in the buildings of the ... Trust ... commitled] themselves and their families to live their lives according to the principles of the United Effort Plan and the Church, and they and their families consent[led] to be governed by the Priesthood leadership.
Additionally, the beneficiaries of the Trust were required to "consecrate their lives, times, talents and resources to the building and establishment of the Kingdom of God on Earth." And those beneficiaries "whol[,] in the opinion of the Presidency of the Church, [did] not honor their commitments to live their lives according to the principles of the United Effort Plan and the Church [were tol remove themselves from the trust property and, if they do not, the Board of Trustees may in its discretion cause their removal."
{ 40 Finally, the Trust's provisions regarding termination were meant to ensure that Trust property remained under the control of the FLDS Church. In the event of the Trust's termination, "the assets of the Trust Estate at that time [were tol become the property of the Corporation of the President of the Fundamentalist Church of Jesus Christ of Latter-Day Saints, corporation sole."
41 In reforming the UEP Trust, the district court stripped the Trust of its essential religious purpose and required that the Trust be administered according to secular principles. In place of these essential religious principles, it seized upon a provision of the Trust requiring that the Trust be administered to "members according to their wants and their needs, insofar as their wants are just." Although the district court relied on this provision to suggest that the Trust had a secular purpose of providing for the needs of its members, the language of the Trust makes clear that "just wants and needs" is a religious determination. And the Trust specifically states that the "Board of Trustees, in its sole discretion, shall administer the Trust consistent with its religious purpose to provide for Church members according to their wants and their needs, insofar as their wants are just." (Emphasis added.)
T 42 The religious purpose of the Trust is also evidenced by the fact that the "just wants" provision was intended to promote the FLDS doctrine of communal property ownership:
The United Effort Plan is the effort and striving on the part of Church members toward the Holy United Order. This central principle of the Church requires the gathering together of fuithful Church members on consecrated and sacred lands to establish as one pure people the Kingdom of God on Earth under the guidance of Priesthood leadership.... [Clonsistent with its religious purpose [the Trust is to be administered tol Church members according to their wants and their needs, insofar as their wants are just.
(Emphasis added.) Indeed, the "just wants" provision cites to FLDS seripture.
11 48 In short, the district court seized upon an isolated trust provision to find a secular component to the Trust where none existed. Because the settlor intended that the advancement of the FLDS religion was the essential purpose of the Trust, the district court's reformation of the trust by stripping it of its religious purpose so changed its purpose and identity that it is a different entity.
C. SCM Had no Attorney-Client Relationship with the Entity Known as the Reformed Trust
144 We now address whether an attorney-client relationship existed between SCM and the Reformed Trust. The Special Fiduciary argues that because SCM previ *1069 ously represented the UEP Trust, the Reformed Trust is therefore the holder of any privileged information. We disagree.
145 Rule 504 of the Utah Rules of Evidence recognizes attorney-client communications as privileged. Utax R. Evin. 504. It provides that "[a] client has a privilege to refuse to disclose, and to prevent any other person from disclosing, confidential communications ... made for the purpose of facilitating the rendition of professional legal services to the client." Id. 504(b). "The attorney-client privilege is intended to encourage candor between attorney and client and promote the best possible representation of the client." Doe v. Maret, 1999 UT 74, ¶ 7, 984 P.2d 980 (internal quotation marks omitted), (overruled on other grounds by Munson v. Chamberlain, 2007 UT 91, ¶ 10, 173 P.3d 848). Rule 504(c) states that "the successor, trustee, or similar representative of a corporation, association, or other organization, whether or not in existence" may claim the privilege The advisory committee's notes provide that "[wlhere there is a dispute as to which of several persons has claims to the rights of a previously existing entity, the court will be required to determine from the facts which entity's claim is most consistent with the purposes of this rule." UtaX R. Evin. 504 advisory committee's note.
T 46 In this case, we conclude that allowing the Special Fiduciary to claim the privilege for communications between SCM and the UEP Trust would be inconsistent with the purpose of rule 504 because the Reformed Trust and the UEP Trust are so different that they cannot be considered the same entity. Indeed, the purposes of these two trusts are inconsistent. The UEP Trust existed solely for the purpose of "preserv[ing] and advanc[ing] the religious doctrines and goals of the [FLDS Church]." In contrast, the purpose of the Reformed Trust is seeu-lar. It is "separate and distinct from ... the FLDS Church, as well as other religious efforts, objectives, doctrines or organizations." Additionally, the Reformed Trust is administered "based on neutral principles of law," independent of priesthood input. This is in stark contrast to the administration of the UEP Trust in which priesthood input was critical. In addition, the beneficiaries of the trusts are different. While participation in the UEP Trust was limited to faithful FLDS members, the Reformed Trust beneficiaries include individuals "who can demonstrate that they had previously made Contributions to either the Trust or the FLDS Church." Therefore, the beneficiaries of the Reformed Trust can include individuals who have left the FLDS Church, joined a rival sect, and/or have been critical of the FLDS Church.
147 Our conclusion that the Reformed Trust cannot be considered the successor of the UEP Trust is also supported by the differences in trust administration. The administration of the UEP Trust has been characterized as "sociological and psychological war" with FLDS Church members. And the Special Fiduciary has admitted that a determination of whether property should be conveyed outright or subject to a spendthrift trust depends in part on whether the transferee is likely to continue to advance the FLDS Church's United Holy Order. In other words, a determination of whether a beneficiary will be given ownership of trust property outright or merely use of that property can depend on whether that beneficiary will promise not to advance a specific FLDS doe-trine. It is clear that the settlor did not intend that the Trust that it created to advance the FLDS religion be reformed and administered in a manner that is hostile to that same religion.
T 48 The Special Fiduciary correctly notes that the Reformed Trust and the UEP Trust are holding primarily the same property. However, we do not find this fact determinative. Generally, when a court reforms a trust ey pres, the reformation is considered a modification of the trust. See UTax CopE § 75-7-418(1)(c) (Supp.2010). But in this case where the Reformed Trust is so different from the original Trust that it cannot be deemed a continuation for purposes of the attorney-client privilege, the assets of the original Trust are deemed to have been purchased by the Reformed Trust.
1 49 The Special Fiduciary also argues that if an attorney-client relationship does not exist between the Reformed Trust and SCM, *1070 any time an entity undergoes a "change of corporate management or control," or amends its bylaws or corporate mission, it will risk severing the attorney-client relationships that have been formed. The Special Fiduciary's argument is misplaced because this case does not involve a mere change in the management of the UEP Trust. Rather, this case involves the district court's reformation of a charitable trust that, absent the defense of laches, would have been set aside because the Reformed Trust does not effectuate the settlor's intent. Unlike a corporation or similar entity, a charitable trust's very existence is tied to the settlor's intent. See Utah Code Ann. § 75-7-418 (noting that a "court may apply cy pres to modify or terminate the trust ... in a manner consistent with the settlor's charitable purposes"); cf. id. § 75-7-410(1) ("A trust terminates to the extent the ... purposes of the trust have become unlawful, contrary to public policy, or impossible to achieve."). If a charitable trust cannot be reformed in a manner that is consistent with the settlor's intent, it should be terminated. In this case, the district court reformed the trust rather than terminating it. Because the district courts reformation of the UEP Trust drastically altered the purpose and identity of the Trust, we hold that the district court's modifications transformed it into an entirely different entity.
III SCM IS NOT REQUIRED TO DISGORGE PRIVILEGED ATTORNEY-CLIENT INFORMATION TO THE REFORMED TRUST
150 We next consider whether SCM is required to disgorge privileged attorney-client communications to the Reformed Trust. Rule 1.9 of the Utah Rules of Professional Conduct describes the duties lawyers owe to former clients. Specifically, "[al lawyer who has formerly represented a client in a matter shall not thereafter ... reveal information relating to the representation except as these Rules would permit or require with respect to a client." Uttar R. or ProF' Conipuctr 1.9(c). An attorney's duty of confidentiality is the "hallmark of the client-lawyer relationship." By safeguarding attorney-client communications, a client is "encouraged to seek legal assistance and to communicate fully and frankly with the lawyer even as to embarrassing or legally damaging subject matters." Id. 1.6, emt. 2 advisory committee's notes. In turn, the client's frankness facilitates the effectiveness of a lawyer in representing the client.
{51 In this case, not only is SCM not required to disgorge privileged attorney-client information related to its representation of the UEP Trust, it is prohibited by rule 1.9(c) from so doing. The Reformed Trust is not the same entity as the UEP Trust and therefore it is not entitled to the UEP Trust's privileged attorney-client information. Requiring the UEP Trust to disgorge privileged information to the Reformed Trust would be contrary to the underlying purpose of the attorney-client priv-flege in encouraging candor between lawyer and client. It would require the UEP trust to turn over possibly embarrassing or legally damaging material to an entity that it perceives as hostile to the FLDS Church and thus hostile to the very purpose of the UEP Trust.
152 The Special Fiduciary argues that disgorgement is necessary because without the records relating to the underlying management and property of the UEP trust, he cannot effectively manage the Reformed Trust. But we disagree. The attorney client privilege protects communications, not facts. Munson v. Chamberlain, 2007 UT 91, ¶ 15, 173 P.3d 848. The property records that the special fiduciary requests are therefore not privileged and are available through discovery. The special fiduciary has not pointed us to any privileged communications that are required for the administration of the Reformed Trust. And while we can imagine some cireumstances where privileged attorney-client communication may facilitate the administration of the Reformed Trust, we believe the importance of safeguarding the confidentiality of attorney-client communications justifies any minor inconvenience that will result. Because requiring SCM to disgorge privileged attorney-client communication is inconsistent with rule 1.9 of the Utah Rules of Professional Conduct, we hold that the district court erred when it *1071 ordered SMC to disgorge privileged communications related to its representation of the UEP Trust.
IV. SCM IS NOT DISQUALIFIED FROM REPRESENTING PARTIES ADVERSE TO THE REFORMED TRUST
T53 We finally address whether SCM is disqualified from representing Movants under rule 1.9 of the Utah Rules of Professional Conduct. The Special Fiduciary argues that SCM cannot represent the Movants because their interests are materially adverse to those of the Reformed Trust. We disagree.
T 54 Rule 1.9 of the Utah Rules of Professional Conduct provides that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client." UtaK R. Pror'u Conpuct 1.9(a)..
1 55 In this case, SCM is not disqualified from representing the movants in matters that are materially adverse to the Reformed Trust because SCM has never represented the Reformed Trust. As previously discussed, SCM represented the UEP Trust. When the district court reformed the UEP Trust in a manner that was inconsistent with the settlor's intent, the Trust was transformed into an entirely new entity for purposes of the attorney-client relationship. The Reformed Trust is therefore not the same client as the UEP Trust.[4]
CONCLUSION
T56 Because the district court's reformation of the UEP Trust was contrary to the settlor's intent, the Reformed Trust cannot be considered the same client as the UEP Trust. The district court therefore erred when it ordered SCM to disgorge to the Special Fiduciary of the Reformed Trust privileged communications between SCM and the UEP Trust. It further erred when it disqualified SCM from representing the Movants in matters that are materially adverse to the Reformed Trust.
Justice PARRISH authored the opinion of the Court, in which Justice DURHAM and Judge THORNE joined.
Chief Justice DURRANT filed a concurring in part and dissenting in part opinion, in which Associate Chief Justice NEHRING joined.
Due to his retirement, Justice WILKINS did not participate herein; Court of Appeals Judge WILLIAM A. Thorne sat.
Justice THOMAS R. LEE became a member of the Court on July 19, 2010, after oral argument in this matter, and accordingly did not participate.

. On June 13, 2011, we stayed the present case pending disposition of the appeal in a related case, Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Wisan, 698 F.3d 1295 (10th Cir.2012) (FLDS v. Wisan). Wisan was an appeal from the federal district court's decision granting the Fundamentalist Church of Jesus Christ of Latter-Day Saints (FLDS Association) a preliminary injunction barring the probate court's further administration of the Trust. Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Wisan, 773 F.Supp.2d 1217, 1236, 1244-45 (D.Utah 2011). On November 5, 2012, the Court of Appeals for the Tenth Circuit vacated the federal district court's order granting a preliminary injunction and remanded with directions to dismiss the claims filed by the FLDS Association. Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne, 698 F.3d 1295, 1299 (10th Cir.2012). We thereafter lifted our stay on December 12, 2012.

. The district court determined that it could not reform the UEP Trust to advance its religious purposes for primarily two reasons. First, it determined that it could not advance the religious purposes of the UEP Trust insofar as those purposes were illegal. Specifically, the district court noted that it could not advance the FLDS doctrines of polygamy, bigamy, or sexual activity between adults and minors. Second, the district court determined that it could not advance the religious purposes of the Trust because it was prohibited by the First Amendment to the United States Constitution from resolving property disputes on the basis of religious doctrines.

. Judge Lindberg also argues that a petition for extraordinary writ is not an appropriate procedure to challenge the validity of the Reformed Trust because such a challenge implicates the rights of the Reformed Trust's beneficiaries. We disagree that our decision here will implicate the validity of the Reformed Trust. Indeed, we explicitly decided in Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Lindberg that, because no one had challenged the district court's reformation of the UEP Trust for three years, the validity of the Reformed Trust could no longer be challenged. 2010 UT 51, 135, 238 P.3d 1054. Although our decision in this case addresses the reformation of the Trust, it does so for the limited purpose of determining whether SCM should be required to turn over the subpoenaed information and whether SCM should be disqualified from representing the Movants.

. SCM and Movants also argue that the Special Fiduciary waived its right to bring a motion to disqualify SCM. Because we resolve the disqualification issue on the grounds that the Reformed Trust and the UEP Trust are not the same client, we need not and do not address the waiver issue.