*This opinion is subject to revision before
publication in the Pacific Reporter*

**2015 UT 20**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

SPENCER J. COX, in his official capacity as
Lieutenant Governor for the State of Utah,
*Petitioner,*

*v.*

THE HONORABLE CLAUDIA LAYCOCK, in her official capacity
as District Court Judge in the Fourth Judicial District,
Millard County, State of Utah,
*Respondent.*

---

JIM DYER, STEVE MAXFIELD, T.J. LOVATO, SCOTT BLACKBURN,
RUSSELL JONES, WENDY LEATHUM, and TODD MACFARLANE,
*Third-Party Cross-Petitioners,*

*v.*

NORMA BRUNSON, in her official capacity as Millard County Clerk;
THE HONORABLE CLAUDIA LAYCOCK, in her official capacity as
District Court Judge in the Fourth Judicial District, Millard
County, State of Utah; and SPENCER J. COX, in his official capacity
as Lieutenant Governor for the State of Utah,
*Third-Party Cross-Respondents.*

No. 20140764
Filed January 30, 2015

Fourth District, Fillmore Dep't
The Honorable Claudia Laycock
No. 140700025

Attorneys:

Sean D. Reyes, Att'y Gen., Thom D. Roberts, Asst. Att'y Gen.,
Salt Lake City, for petitioner

Brent M. Johnson, Salt Lake City, for respondent

Steven Maxfield, Kanosh, Utah, for real party in interest pro se

A.C.J. Nehring, opinion of the Court except Part II

Dwight G. Beckstrand, Kanosh, Utah, for real party in interest
Jim Dyer

Kathleen M. Liuzzi, Salt Lake City, for real party in interest
James I. Withers

Todd MacFarlane, Kanosh, Utah, for real parties in interest
T.J. Lovato, Russell Jones, Wendy Leathum,
Scott Blackburn, Todd MacFarlane

Richard Waddingham, Delta, Utah, for real party in interest
Millard County

---

Associate Chief Justice Nehring authored the opinion of the Court with respect to Parts I, IV, and VI, in which Chief Justice Durrant, Justice Durham, Justice Parrish, and Justice Lee joined, and the opinion of the Court with respect to Part V, in which Chief Justice Durrant, Justice Durham, and Justice Parrish joined, and the opinion of the Court with respect to Part III, in which Justice Durham and Justice Parrish joined.

Associate Chief Justice Nehring authored a dissent with respect to Part II, in which Justice Parrish joined.

Justice Lee authored the opinion of the Court with respect to Part II of his opinion, in which Chief Justice Durrant and Justice Durham joined, an opinion dissenting in part with respect to Part I of his opinion, in which Chief Justice Durrant joined, and an opinion concurring in part with respect to Part III of his opinion.

---

Associate Chief Justice Nehring, opinion of the Court:

## INTRODUCTION

¶ 1 This matter comes before us by a petition for extraordinary writ filed by Utah Lieutenant Governor Spencer Cox regarding the Republican primary election for Millard County Commissioner Seat A. The lieutenant governor challenges an August 14, 2014 district court order that set aside the election and ordered the Millard County Clerk to hold a new election as soon as possible.

A.C.J. NEHRING, opinion of the Court except Part II

¶ 2    In an order issued September 5, 2014, we granted the lieutenant governor's petition and affirmed in part and vacated in part the district court's order.  We affirmed that portion of the order that set aside the election.  However, we vacated the part of the district court order requiring the Millard County Clerk to hold a new election.  Recognizing that the election code does not address the specific circumstances presented here, we concluded that it was not the intent of the legislature that a political party be without a candidate on the general election ballot when the primary election has been set aside.  We therefore looked to the most analogous provisions of the Code to guide us.  Utah Code section 20A-1-501 supplies procedures for filling candidate vacancies in various situations, and we ordered that the Republican candidate be filled according to the procedures in subsection (1)(c)(iii).  We explain our order more fully here.

## BACKGROUND

¶ 3    On June 24, 2014, Millard County held its Republican primary election for the position of County Commissioner Seat A.  Mr. Dyer challenged Mr. Withers, the incumbent.  According to Mr. Dyer, the unofficial vote count on the evening of June 24, 2014, yielded 1,004 votes for Mr. Dyer and 1,003 votes for Mr. Withers.  The official canvass was conducted on July 1, 2014, at which Mr. Dyer alleged the County Clerk's office produced additional ballots that had not previously been disclosed to the candidates.   The canvass tally resulted in 1,014 votes for Mr. Withers and 1,009 votes for Mr. Dyer, and Mr. Withers was declared the winner.

¶ 4    On July 7, 2014, Mr. Dyer requested an official recount under Utah Code section 20A-4-401, specifically challenging nine ballots as well as all provisional ballots because they had not been disclosed to him until after the official canvass.  County Clerk Brunson conducted the recount on July 15, 2014.  She certified the results of the recount as 1,014 votes for Mr. Withers and 1,009 votes for Mr. Dyer.

¶ 5    The county commissioners met the same day to sit as the official canvassing board.  Mr. Withers sat on the canvassing board in his official capacity as a county commissioner.  The board discussed the recount, heard Mr. Dyer's arguments, and took public comments.  In the end, the three-member canvassing board voted to certify the clerk's count and declared Mr. Withers the winner.

A.C.J. Nehring, opinion of the Court except Part II

¶ 6    On July 16, 2014, Mr. Dyer together with concerned voters T.J. Lovato, Russell Jones, and Wendy Leathum (collectively, Voters)[1] filed a petition under Utah Code sections 20A-4-402 and 20A-4-403 contesting the results of the election. The petition named Mr. Withers, in his capacity as a candidate, as the sole respondent.  The petition specifically challenged twenty-one votes:  three absentee ballots, two voter forms, one potentially non-Republican voter,  ten provisional ballots,  four  ballot affidavits, and one voter prevented from voting.

¶ 7    On August 1, 2014, the district court held a hearing on the matter in which Mr. Dyer, the Voters, and Mr. Withers were present and represented by counsel.   Millard County Clerk Brunson also appeared as a witness.

¶ 8    The district court issued its Memorandum Decision, Ruling, and Order on August 14, 2014.  At the outset, the court noted that "petitioners had probably filed this case against the wrong respondent."  Nonetheless, the court heard and ruled on the case because neither party raised the issue of improper parties. The court discussed each of Mr. Dyer's allegations in turn and ultimately concluded that "the validity of this election cannot be established."  The court determined that at least seven ballots were incorrectly counted and one voter was prevented from legally voting; therefore, because only five votes separated the candidates, the eight votes in question were sufficient to grant relief.  The court explained that it could not determine for whom those illegal votes had been cast, and thus could not ascertain which candidate received the highest number of votes in order to declare a winner.  Instead, the district court set aside the election results and ordered the county clerk to organize a new election immediately.  Neither party appealed the district court's order.

¶ 9    On August 26, 2014, the lieutenant governor filed a petition for extraordinary writ with this court challenging the district court order.  The lieutenant governor petitions this court because he asserts that, as chief elections officer for the state of Utah, he "is substantially impacted by" the district court order. And because he was not named as a party below and cannot appeal the order, he therefore contends that he has no other plain,

---

[1] Additional voters Scott Blackburn, Todd Macfarlane, and Steve Maxfield later joined the district court proceeding.

speedy, and adequate remedy. The lieutenant governor seeks to vacate the district court order and affirm the certified results of the primary election.

¶ 10 The lieutenant governor raises three arguments in his petition. First, he contends that the district court did not have jurisdiction to adjudicate Mr. Dyer's petition due to a lack of standing. Second, the lieutenant governor alleges that Mr. Dyer's challenge did not meet the statutory requirement for election contests because the lieutenant governor reads the statute to "require[] proof" of a different result "if you added or subtracted the actual votes." He asserts that because the district court could not determine for whom the erroneous votes were cast, there is no proof that the illegal votes would have changed the result. Thus, in the absence of a final determination that Mr. Dyer would have won, he argues that there can be no valid contest of the election and the district court had no basis to issue its order. Third, the lieutenant governor argues that the district court acted outside its powers when it ordered the clerk's office to hold a new election.

¶ 11 On September 3, 2014, Judge Laycock filed a response to the lieutenant governor asking this court to affirm the district court order. The response asserts that the district court had jurisdiction below and that it properly set aside and ordered a new election.

¶ 12 Mr. Dyer also filed a response and opposition to the lieutenant governor as a real party in interest. Mr. Dyer argues that he had standing because he was not required to name the county clerk as a party to the action below. Additionally, he asserts that the lieutenant governor is not an appropriate party to file a writ in this matter because his role as chief election officer is purely supervisory. He further argues that the lieutenant governor's filing of the petition amounts to improper advocacy on the part of Mr. Withers's candidacy.

¶ 13 Millard County and the Millard County Clerk also entered the fray, agreeing with the lieutenant governor's petition that the district court acted beyond its statutory authority in ordering the new election. The county and county clerk also noted that the clerk's office considered options for holding a new election, but that it "could not comply with the statutory deadlines imposed by Utah law."

A.C.J. Nehring, opinion of the Court except Part II

¶ 14 Finally, in addition to responding to the lieutenant governor, the Voters, acting through counsel or pro se, submitted a third-party cross-petition. They requested that this court affirm the district court's order to set aside the primary election, but alternatively requested that both candidates be included on the November general election ballot as unaffiliated candidates, even if that requires "suspend[ing] or modif[ying]" the statute "as necessary."

¶ 15 We have jurisdiction under Utah Code section 78A-3-102(2).

## STANDARD OF REVIEW

¶ 16 This matter is before us by petition for extraordinary writ under Utah Rule of Civil Procedure 65B. The granting of relief is discretionary, and "[u]nlike a party filing a direct appeal, a petitioner seeking rule 65B(d) extraordinary relief has no right to receive a remedy that corrects a lower court's mishandling of a particular case."[2] "The question of whether to grant a petition for extraordinary relief lies within the sound discretion of this court."[3]

¶ 17 Rule 65B provides for the scope of review when, as here, wrongful use of judicial authority is alleged: "[T]he court's review shall not extend further than to determine whether the respondent has regularly pursued its authority."[4] We have held that "[a] court wrongfully uses its judicial authority when it abuses its discretion."[5] When the issue before the court involves statutory interpretation, "a mistake of law may constitute an abuse of discretion."[6] However, even where a mistake of law or abuse of discretion is found, this court nonetheless retains discretion

---

[2] *State v. Barrett*, 2005 UT 88, ¶ 23, 127 P.3d 682.

[3] *Snow, Christensen & Martineau v. Lindberg*, 2013 UT 15, ¶ 22, 299 P.3d 1058.

[4] Utah R. Civ. P. 65B(d)(4).

[5] *Snow, Christensen & Martineau*, 2013 UT 15, ¶ 21.

[6] *Barrett*, 2005 UT 88, ¶ 26.

whether to grant the relief requested.[7] Thus, we have explained that "a court must look to the nature of the relief sought, the circumstances alleged in the petition, and the purpose of the type of writ sought in deciding whether to grant extraordinary relief."[8] Therefore, we review the district court order for abuse of discretion, retaining our discretion to grant any relief.

## ANALYSIS

¶ 18 We first consider whether to grant the lieutenant governor's petition for extraordinary writ challenging the district court order. We conclude that the lieutenant governor had no other plain, speedy, and adequate remedy, and we therefore grant the petition. Next, a majority of this court holds that the district court order annulling and setting aside the election could not be challenged following the expiration of the ten-day statutory appeal deadline; that portion of the order is therefore affirmed. However, we determine that the district court exceeded its authority when it ordered a new election. Such an order constitutes an abuse of discretion, and we vacate that part of the order. However, we recognize that the Utah Code does not prescribe procedures to fill a candidate vacancy when a primary election is annulled and set aside. We conclude that it could not have been the intent of the legislature to leave the candidacy vacant, and we therefore look to the most analogous provisions in the election code to ascertain how the legislature intended the current situation to be resolved. We conclude that the procedures for filling a candidate vacancy under Utah Code section 20A-1-501 provide useful guidance. On that basis, we order the Republican candidacy be filled according to its provisions. Finally, we deny the third-party cross-petition because an alternative remedy is available in the form of an appeal, where cross-petitioners were parties to the proceedings below.

---

[7] *Id.* ¶ 23 ("[A] party petitioning for rule 65B(d) extraordinary relief is not entitled to receive relief, even if that party successfully establishes that a lower court abused its discretion . . . .").

[8] *Id.* ¶ 11 (internal quotation marks omitted).

A.C.J. Nehring, opinion of the Court except Part II

## I.  WE GRANT THE LIEUTENANT GOVERNOR'S PETITION FOR EXTRAORDINARY WRIT

¶ 19  Rule 65B permits a person to petition this court for relief based on several enumerated grounds if "no other plain, speedy and adequate remedy is available."  Whether to grant the petition is a threshold question in this case and the determination "lies within the sound discretion of this court."[9]  In determining whether to grant the petition, we look to several factors, including "the egregiousness of the alleged error, the significance of the legal issue presented by the petition, the severity of the consequences occasioned by the alleged error, and any additional factors that may be regarded as important to the case's outcome."[10]

¶ 20  We conclude that the lieutenant governor had no other plain, speedy, and adequate remedy, and we therefore grant the petition.  The lieutenant governor seeks relief under Utah Rule of Civil Procedure 65B(d)(2)(A) where "an inferior court . . . has exceeded its jurisdiction or abused its discretion."  As the state's chief elections officer, the lieutenant governor has an interest in the election contest, even if his authority over a county primary election is only supervisory.  Because he was not a party to the action below, the lieutenant governor could not appeal the district court's decision[11] and therefore did not have another plain,

---

[9] *Snow, Christensen & Martineau v. Lindberg*, 2013 UT 15, ¶ 22, 299 P.3d 1058.

[10] *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Lindberg*, 2010 UT 51, ¶ 24, 238 P.3d 1054 (internal quotation marks omitted).

[11] *See Utah Down Syndrome Found., Inc. v. Utah Down Syndrome Ass'n*, 2012 UT 86, ¶¶ 9–10, 293 P.3d 241 (holding that nonparties cannot appeal a court order).  Moreover, the lieutenant governor could not appeal the district court decision even if the parties below did not object because "acquiescence of the parties is insufficient to confer jurisdiction on the court."  *Bradbury v. Valencia,* 2000 UT 50, ¶ 8, 5 P.3d 649 (internal quotation marks omitted).

speedy, and adequate remedy.[12] Moreover, we do not find that the lieutenant governor's decision not to intervene in the case below forecloses his petition for relief.[13] We have recognized that where parties are not necessary, they may make tactical decisions not to intervene.[14] Furthermore, given the significance of the legal issues presented and the necessity of prompt resolution in advance of the general election,[15] we conclude that a petition for extraordinary writ should be granted. Having granted the petition, we turn to the merits of the lieutenant governor's arguments.

## II. STATUTORY APPEAL DEADLINE

¶ 21 I disagree with this court's holding that the district court order to annul and set aside the election "became unassailable when no appeal was taken by the parties" within the ten-day deadline set by statute.[16] I would therefore reach the merits of the lieutenant governor's arguments on that issue.

¶ 22 The Utah Constitution grants this court "original jurisdiction to issue all extraordinary writs,"[17] and we may issue the writ when "no other plain, speedy and adequate remedy is

---

[12] *See Snow, Christensen & Martineau*, 2013 UT 15, ¶ 24 ("[W]hen an individual who is not a party to a district court proceeding is adversely affected by an order or judgment, the procedural mechanism for challenging the district court's action is through a petition for extraordinary writ.").

[13] *Krejci v. City of Saratoga Springs*, 2013 UT 74, ¶ 12, 322 P.3d 662 (refusing to adopt a rule requiring "intervention as a prerequisite to the filing of a petition for extraordinary writ").

[14] *Id.* ¶ 18 (recognizing that "petitioners' decision to sit on the sidelines [during district court proceedings] was both strategically and economically defensible").

[15] *Id.* ¶ 20 (noting that petitioner could have filed a separate suit in district court regarding a ballot referendum but given "the need to seek relief occurred so shortly before the ballot decision would have to be made, a new proceeding in the district court was not a 'speedy' or 'adequate' remedy").

[16] *Infra* ¶¶ 60–66.

[17] UTAH CONST. art. VIII, § 3.

available."[18]   Thus, we will only issue a writ in exceptional circumstances, balancing due deference to the legislature with our constitutional prerogative.  For example, in *Renn v. Utah State Board of Pardons*, this court permitted a defendant to challenge a decision by the Board of Pardons through an extraordinary writ even though the legislature had insulated Board decisions from judicial review.[19]  We allowed the challenge because "where there is a gross and flagrant abuse of discretion and fundamental principles of fairness are flouted, a court may, giving appropriate deference to legislative policy[,] . . . intervene to correct such abuses by means of an appropriate extraordinary writ."[20]  In my view, the lieutenant governor has alleged just such an abuse, claiming that the district court erroneously denied Mr. Withers his candidacy and citizens their right to vote.  As Utah's chief election official, the lieutenant governor had an interest in the outcome of the case.  But because he was not a party below, the only remedy available to him was through a writ.  I believe this situation rises to the level of the sort of exceptional circumstance that an extraordinary writ was meant to address.

¶ 23 Therefore, I would conclude that the lieutenant governor's request was not foreclosed by the statutory language declaring the office vacant at the close of the parties' ten-day appeal deadline.  Certainly election contests represent a unique form of litigation due, in part, to their time-sensitive nature.  It is presumably for this reason that the legislature provided the brief ten-day window for the parties to appeal an election decision.  But the issuing of a writ is an equitable power derived from our duty to prevent a "flagrant abuse of discretion."[21]  To declare the district court's decision insulated from review curtails our constitutional power and deprives the lieutenant governor of the only remedy available to him.  I also note concern about possible

---

[18] UTAH R. CIV. P. 65B(a).

[19] 904 P.2d 677, 683–84 (Utah 1995).

[20] *Id.*; *see State v. Barrett,* 2005 UT 88, ¶ 19, 127 P.3d 682 (recognizing that in *Renn* "we relied upon this court's constitutional authority to issue extraordinary writs" even though "the statute foreclos[ed] judicial review").

[21] *Renn*, 904 P.2d at 683.

due process implications for individuals whose interests may be affected because they were not made parties to the action and may not have had notice or a meaningful opportunity to be heard. We have extolled "the practical utility of the flexibility of extraordinary writs in various circumstances,"[22] and I believe such flexibility is warranted here.

¶ 24 I would instead evaluate the lieutenant governor's request under the equitable doctrine of laches. We have explained that under rule 65B "there is no fixed limitation period governing the time for filing" extraordinary writs.[23] However, we cautioned that a writ "should be filed within a reasonable time after the act complained of has been done or refused" because "the equitable doctrine of laches is available to dismiss untimely writs."[24] I believe that in filing his petition on August 26—twelve days after the district court's order—the lieutenant governor acted within a reasonable time. Under the doctrine of laches, we look to a party's lack of diligence and the resulting injury.[25] I cannot say that the lieutenant governor acted without diligence when he submitted his petition less than two weeks after the district court order, particularly given that he was not a party to the action below and may not have had notice of the election contest. I therefore would conclude that the lieutenant governor could challenge the district court order to annul and set aside the election, and I would reach the merits of that claim.

### III. THE DISTRICT COURT ORDER SETTING ASIDE THE ELECTION WAS PROPER

¶ 25 The lieutenant governor asserts, and the dissent agrees,[26] that Mr. Dyer did not satisfy the statutory requirements for an election contest. The lieutenant governor argues that a court "cannot sustain an election contest unless it determines who the individual votes were for and how their addition or subtraction

---

[22] *Id.* at 684.

[23] *Id.*

[24] *Id.*

[25] *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Lindberg*, 2010 UT 51, ¶ 27, 238 P.3d 1054.

[26] *Infra* ¶¶ 51–59.

from the vote totals of the candidates would change the result." We do not agree with this interpretation of the statute's election contest procedures. We hold that Mr. Dyer satisfied the requirements of the statute, and that the district court properly annulled and set aside the election.

### A. Mr. Dyer and the Voters Could Properly Sustain Their Election Contest

¶ 26 The lieutenant governor claims that Mr. Dyer did not satisfy the requirements of the election contest statute. He bases his argument on a reading of Utah Code section 20A-4-402, which provides the grounds upon which a contest may be brought. Mr. Dyer and the Voters base their challenge on the following statutory grounds:

> (1) The . . . nomination of any person to any public office . . . may be contested according to the procedures established in this part only:

>> (a) for malconduct, fraud, or corruption on the part of the judges of election at any polling place, or of any board of canvassers, or any judge or member of the board *sufficient to change the result*;

>> . . . .

>> (d) when illegal votes have been received or legal votes have been rejected at the polls *sufficient to change the result*;

>> (e) for any error of any board of canvassers or judges of election in counting the votes or declaring the result of the election, *if the error would change the result*;

>> . . . .

>> (f) *when the election result would change* because a sufficient number of ballots containing uncorrected errors or omissions have been received at the polls;

>> . . . .

A.C.J. NEHRING, opinion of the Court except Part II

> (h) when an election judge or clerk was a party to malconduct, fraud, or corruption *sufficient to change the result* of the election . . . .[27]

The lieutenant governor reads this provision to "require[] proof that the result would have been different if you added or subtracted the actual votes." We disagree. The statutory condition that the alleged malconduct, errors, or illegal voting be "sufficient to change the result" acts as a threshold materiality requirement. Ostensibly, the legislature believed that an election contest that cannot possibly lead to a different result does not warrant the time and attention of the court. By way of example, consider an election resulting in a 100-vote margin between two candidates. If the defeated candidate brought a challenge alleging that forty illegal votes had been counted, such a challenge, even if proven, could not impact the final result. It would not merit review by a court, and thus the legislature likely sought to prevent such immaterial contests. In contrast, when a challenger alleges errors that could actually change the result, the court's review is warranted.

¶ 27 The lieutenant governor's interpretation of the statute would foreclose a challenge any time the ballots could not be opened, reviewed, and recounted.[28] Under this approach, even in

---

[27] UTAH CODE § 20A-4-402 (emphases added).

[28] At oral argument, counsel for the lieutenant governor argued that a court could determine for whom a particular individual voted through voluntary testimony by the voter or by looking to circumstantial evidence such as party affiliation or whether a voter put signs for a particular candidate in his front yard. Because we disagree with the lieutenant governor's statutory interpretation, we do not reach this issue. However, we express great suspicion that these types of circumstantial evidence could properly be relied upon to determine the outcome of an election. *See* 29 C.J.S. *Elections* § 480 ("As a general rule, a legal voter cannot be compelled to disclose for whom he or she voted."); *see also Helm v. State Election Bd.*, 589 P.2d 224, 229 (Okla. 1979) ("There can be no doubt that where paper ballots are concerned, the testimony of voters as to how they voted is not competent."). *But see In re Petition to Contest the Gen. Election for Dist. Justice in Judicial Dist. 36-3-03 Nunc Pro Tunc*, 670 A.2d 629,

(con't.)

circumstances where there is wide-scale or egregious conduct (for example, intentional burning of ballot boxes), a defeated challenger may have no recourse because the votes could not be counted. We elect to take a more sensible approach—an approach that comports with the statute's plain language. We hold that a contest may move forward under section 20A-4-402(a), (d), (e), (f), or (h) where a candidate challenges enough votes to meet or exceed the margin of victory.

¶ 28 Additionally, this approach does not open the floodgates to election contests. Challengers remain bound by our civil pleading standards.[29] Additionally, the election code itself provides a heightened pleading requirement. Section 20A-4-403(2) sets forth filing procedures for a petition to contest an primary election. Where, as here, illegal voting is alleged, the candidate must provide the name and address of each person whose vote he intends to contest at trial.[30] If a voter is not included on the petition list, the challenger forfeits his right to contest that vote.[31] This requirement provides a significant hurdle to prevent individuals from indiscriminately challenging elections without evidence of wrongdoing or errors.

¶ 29 Moreover, even with carefully prescribed instructions for election contests, the statute nowhere requires a challenger to state for whom each disputed vote was cast.[32] The lieutenant governor cites section 20A-4-403(2)(c) as evidence that the votes must be capable of a final accounting. This section provides that when challenging illegal votes or rejected legal votes, "it is sufficient to state generally" that illegal votes were given to the declared winner or legal votes were denied another candidate such that the final tally of legal votes would yield a different

---

638–39 (Pa. 1996) (allowing voluntary testimony of voters as evidence of how they originally voted).

[29] *See* UTAH R. CIV. P. 8(a) (providing that a claim "shall contain a short and plain: (1) statement of the claim showing that the party is entitled to relief; and (2) demand for judgment for specified relief").

[30] UTAH CODE § 20A-4-403(2)(b)(vii).

[31] *Id.* § 20A-4-403(2)(d)(ii).

[32] *Id.* § 20A-4-403.

winner.[33] But, as explained above, that section merely sets forth the general filing procedures. It does not speak to the ultimate level of proof required for the contested votes. Section 20A-4-403(2)(a) prescribes when and where the petition is to be filed, subsection (b) details the required contents of the petition, and subsection (c) provides the applicable pleading standard for the petition. This pleading standard simply requires the challenger to allege enough wrongly counted or wrongly rejected votes, which, if proven, would yield a different victor than the person declared elected. Moreover, the statute requires the challenger only to "state generally" his allegations regarding the disputed vote count. Thus, this language cannot be read to require the challenger to submit definitive proof of the final election result. It is enough to challenge the number of votes that would be sufficient to change the result, even if that result cannot be determined.

¶ 30  In sum, because Mr. Dyer challenged over twenty votes as illegal in an election with a five-vote margin, we hold that he met his pleading burden and his election contest was properly before the district court.

*B. The District Court Properly
Set Aside the Election*

¶ 31  The lieutenant governor contends that the district court had no authority to annul and set aside the election under the grounds asserted by Mr. Dyer. He bases this conclusion on Utah Code section 20A-4-402, which he reads to require a challenger to prove the candidate who would have received each contested vote. Because we do not agree with his interpretation of that provision,[34] we decline to adopt his limitation of the remedies available under section 20A-4-404.

¶ 32  Section 20A-4-404(4)(c) sets forth the remedies available in an election contest:

> (c)(i) After all the evidence in the contest is submitted, the court shall enter its judgment, either confirming the election result or annulling and setting aside the election.

---

[33] *Id.* § 20A-4-403(2)(c).

[34] *See supra* Part III.A.

15

A.C.J. NEHRING, opinion of the Court except Part II

> (ii) If the court determines that a person other than the one declared elected received the highest number of legal votes, the court shall declare that person elected.

Thus, under this provision, a court may confirm the election results, annul and set aside the election, or declare a winner if one can be determined. The lieutenant governor contends that these remedies cannot be provided in all circumstances, but that they correspond to two different types of election contests under section 20A-4-402(1): (a) grounds that render the candidate ineligible[35] and (b) grounds that votes were improperly received, rejected, or counted.[36] He argues that annulling and setting aside an election is appropriate only when the candidate has been ruled ineligible. In contrast, when the grounds relate to illegal votes, he argues that the court is statutorily mandated to declare a winner. This reading is based on the lieutenant governor's interpretation of section 20A-4-402. Under his view, when there is a challenge based on illegal votes, the court must be able to determine for whom each disputed vote was cast because it must know whether the challenge is sufficient to change the election result. He argues that, given that premise, the court must necessarily be able to determine a winner and thus, under section 20A-4-404(4)(c)(ii), is mandated to "declare that person elected."

¶ 33 We conclude that the statute does not so constrain the courts. As explained above, we read the statute to permit an election contest even if the contested votes cannot ultimately be counted, as when ballots are lost or destroyed. But neither the plain language of the text nor the structure of the provisions suggests that the statutory remedies correspond to only certain types of challenges. The legislature has empowered district courts to review evidence in a variety of election circumstances and either confirm the result or annul and set aside the election. The court must declare a winner, but only if a winner can be determined.[37] Thus, on its face, the statute contemplates a situation in which the court will be unable to determine a winner.

---

[35] UTAH CODE § 20A-4-402(1)(b), (c), and (g).

[36] *Id.* § 20A-4-402(1)(a), (d), (e), (f), and (h).

[37] *Id.* § 20A-4-404(4)(c)(ii).

The court need not confirm an election result when it finds illegal voting has occurred but cannot count the votes.

¶ 34 The statutory structure also reinforces this understanding.[38] The legislature did not divide the grounds into separate categories and specifically assign remedies based on their type. And there is no limiting language that suggests certain remedies apply only to specific contests. Rather, the structure of the statute—one provision setting forth the contest grounds (section 20A-4-402) and one provision for available dispositions (section 20A-4-404)—indicates the intent that all remedies be available regardless of the contest ground asserted.

¶ 35 In the present case, the district court considered the contested votes individually and determined that seven had been illegally cast and one legal voter had been prevented from voting. The court did not go on to consider the additional ballots that had been contested because it found that eight illegal votes in a five-vote-margin election were enough to warrant setting aside the election results. It also concluded that a winner could not be determined due to the mishandling of the contested ballots. Therefore, the district court was not bound to declare a winner in such circumstances.

## IV. THE DISTRICT COURT ORDER MANDATING A NEW ELECTION CONTRADICTS EXPRESS STATUTORY LANGUAGE

¶ 36 We next consider that part of the district court order mandating the Millard County Clerk to hold a new primary election. Because we conclude the district court acted in contravention of the statute, we find that the court abused its discretion and reverse that portion of the order.

¶ 37 The lieutenant governor challenges the district court's order to hold a new election because he argues that the statutory language does not authorize a court to order a special election. In its response to the lieutenant governor's petition, the district

---

[38] *See Hi-Country Prop. Rights Grp. v. Emmer*, 2013 UT 33, ¶¶ 23–28, 304 P.3d 851 (looking to the "structure and context" of the statute to determine its meaning); *State v. Smith*, 2005 UT 57, ¶¶ 11, 13, 122 P.3d 615 (confirming the meaning of a statute based on its "plain language and structure").

court acknowledged that the "election statutes seemingly do not answer the question of what should or must happen once an election is set aside. The statutes do not provide a remedy beyond the election being invalidated." The court asserted, therefore, that absent further court action, both the candidates and the voters of Millard County would be left without an adequate remedy. Citing the court's equitable power, the district court explained that it ordered a new election as a means to provide relief to all parties.

¶ 38   Utah Code section 20A-4-404 sets forth the means of disposition for an election contest. After reviewing all the evidence, the court may confirm the election result, annul and set aside the election, or, if it is possible, declare another person the winner.[39] The statute nowhere authorizes the court to order a new election. Additionally, in the provision governing appeals of an election contest decision, the Utah Code provides that "[w]henever an election is annulled or set aside by the judgment of a court and no appeal is taken within 10 days, the certificate of election, if any has been issued, is void, and the office is vacant."[40] Moreover, the circumstances for authorizing a special election are expressly limited and do not encompass the situation presented here.[41]

¶ 39   Recognizing that the district court sought to fashion the most appropriate remedy given the circumstances, we nonetheless hold that by ordering the new election the district court contravened the dictates of the election code. This mistake of law constituted an abuse of discretion warranting extraordinary relief; we therefore reverse that part of the district court order.

---

[39] Utah Code § 20A-4-404(4)(c).

[40] *Id.* § 20A-4-406(2).

[41] *See id.* § 20A-1-203(5)(a) (providing that a local legislative body may call a special election "only for" certain enumerated circumstances).

A.C.J. Nehring, opinion of the Court except Part II

## V. IN THE ABSENCE OF CLEAR STATUTORY DIRECTION, WE LOOK TO ANALOGOUS PROVISIONS TO CARRY OUT THE INTENT OF THE LEGISLATURE

¶ 40   Having affirmed annulment of the election, our task is not complete. We have repeatedly asserted that "this Court's primary responsibility in construing legislative enactments is to give effect to the Legislature's underlying intent."[42] Our duty is directed by the statute's "plain language, in light of the purpose the statute was meant to achieve."[43] And "[w]hen the plain meaning of the statute can be discerned from its language, no other interpretive tools are needed."[44]

¶ 41   This case, however, does not present a situation of vague or ambiguous statutory language. Instead, the Code is silent regarding these circumstances. There is no provision in the election code that describes how to fill a candidate vacancy in the case of an annulled primary election,[45] and the limited grounds under which a special election can be held do not apply here.[46] We conclude, however, that the legislature did not intend the vacancy resulting from an annulled primary to continue in perpetuity. We therefore look to analogous provisions within the election code to carry out the legislature's intent.

¶ 42   From the outset, we emphasize that we do not undertake such an endeavor lightly. Our task is to seek the intent of the legislature, not to substitute our own wisdom in its stead.[47] To

---

[42] *W. Jordan v. Morrison*, 656 P.2d 445, 446 (Utah 1982).

[43] *J.M.W. v. T.I.Z. (In re Adoption of Baby E.Z.)*, 2011 UT 38, ¶ 15, 266 P.3d 702 (internal quotation marks omitted).

[44] *LPI Servs. v. McGee*, 2009 UT 41, ¶ 11, 215 P.3d 135.

[45] *See* Utah Code § 20A-1-501 (providing procedures to fill candidate vacancies); *id.* § 20A-1-508 (midterm vacancies).

[46] *See id.* § 20A-1-203(5).

[47] *Eames v. Bd. of Comm'rs*, 199 P. 970, 972 (Utah 1921) ("It is the duty of this court, according to its best knowledge and understanding, to declare the law as it finds it, and determine the intent and purpose thereof from the language used by the Legislature in expressing such purpose and intention.").

that end, when a statute is silent regarding particular circumstances and we determine that such a gap was not the intent of the legislature, "we must determine the best rule of law to ensure that the statute is applied uniformly."[48] We "analyze the act in its entirety and harmonize its provisions in accordance with the legislative intent and purpose."[49]

¶ 43 Section 20A-1-501 of the election code provides procedures for filling candidate vacancies before a general election. While it does not address the specific circumstances here, it presents the closest analogy to it and is therefore instructive. Under certain circumstances, for most local positions, "the county central committee of a political party . . . may certify

---

[48] *Mariemont Corp. v. White City Water Improvement Dist.*, 958 P.2d 222, 226 (Utah 1998); *see also Fausnight v. Perkins*, 994 So. 2d 912, 922 (Ala. 2008) (See, J., concurring) ("When a statute is silent, this Court will look outside of the plain language of the statute to determine the intent of the legislature."); *State v. Mootz*, 808 N.W.2d 207, 221 (Iowa 2012) ("When the statutory language is silent, legislative intent can be gleaned from the purposes and underlying policies of the statute, along with the consequences of various interpretations."); *Anderson v. Ochsner Health Sys.*, 2013-2970, p. 3 (La. 7/1/14) ___ So. 3d ___ ("[B]ecause the statute is silent . . . , the court, in interpreting the statute, is tasked with determining the legislative intent."); *Griffin v. Griffin*, 92 A.3d 1144, 1149 (Me. 2014) ("If the statutory language . . . is silent on a particular point, we will then consider other indicia of legislative intent including the purpose of the statute." (internal quotation marks omitted)); *Miss. Methodist Hosp. & Rehab. Ctr. v. Miss. Div. of Medicaid*, 21 So. 3d 600, 607 (Miss. 2009) ("[I]f a statute . . . is silent on a specific issue[,] . . . . the ultimate goal of this Court is to discern the legislative intent." (citation omitted)); *Ogborne v. Mercer Cemetery Corp.*, 963 A.2d 828, 834 (N.J. 2009) ("In light of the Act's silence on the issue, we look to the underlying legislative intent."); *Clarkston v. Bridge*, 539 P.2d 1094, 1099 (Or. 1975) ("When the legislature has not spoken on a particular issue which arises under a statute, it is our duty to determine their probable intent.").

[49] *Mariemont Corp.*, 958 P.2d at 225 (internal quotation marks omitted).

the name of another candidate to the appropriate election officer."[50] The statute then provides for three scenarios: (a) replacement of a candidate before the primary election, (b) replacement of a candidate who was certified without a primary election, and (c) replacement of a candidate who won the primary election.[51] In each case, the party may select a replacement candidate if the original candidate dies, resigns due to a physical or mental disability, or is disqualified by an election official for improper filing or nominating procedures.[52]

¶ 44 Utah Code section 20A-1-501 does not address a situation in which the result of a primary election is set aside. The lieutenant governor contends that this silence means that the party will simply be without a candidate on the general election ballot. Although the statute is silent on this situation, we disagree with the lieutenant governor's interpretation of the statutory scheme. Section 20A-1-501 provides a means for political parties to submit a candidate in an emergency situation. The circumstances provided for in the statute therefore reflect the most common situations that would render a political party without a candidate. Section 20A-1-501 also appears to strike a balance between respecting voter decisions in primary elections and ensuring that political parties can make necessary substitutions. If replacements were permitted in all circumstances, a political party could effectively overrule the decision of its voters in the primary election and name its own candidate. By allowing the party to submit a replacement candidate only in rare circumstances, the legislature respects the choice of voters. But where the party is left without a candidate through no fault of its own, it should be able to substitute one.

¶ 45 The Code's midterm vacancy protocols are instructive as well. There, the legislature set forth various procedures for filling a midterm vacancy depending on the timing of the vacancy.[53] If the vacancy arises well before the primary election, the procedure parallels a regular election—a nominated party candidate or a

---

[50] UTAH CODE § 20A-1-501(1).

[51] *Id.*

[52] *Id.*

[53] *Id.* § 20A-1-508.

qualified independent candidate can run in the general election.[54] But if the vacancy arises closer to the date of the general election, the procedures reflect the expedited timeline.[55] The statute even permits a party to summarily place an individual *in office* for the remainder of the unexpired term.[56] It would make little sense for the legislature to so empower a political party for midterm vacancies and yet leave the party unable to name its own candidate for the general election ballot. If political parties can "summarily certify" a candidate for the general election ballot even before the primary election date,[57] it stands to reason that a party may summarily certify a candidate when the primary itself is annulled.

¶ 46 We therefore determine that the legislature did not intend that a political party be entirely foreclosed from nominating its candidate in advance of the general election when the primary has been set aside through no fault of the party. We conclude that section 20A-1-501(c)(iii) regarding candidacy vacancies presents the closest analogy to the present situation and thus order that the Republican candidate be certified according to the procedures therein.

---

[54] *Id.* § 20A-1-508(3).

[55] *See id.* § 20A-1-508(4) (when a vacancy arises after April 9 but more than 75 days before the primary election, candidates have five days to submit their names and the political party will select among them); *id.* § 20A-1-508(5) (when a vacancy arises 75 days or less before the primary election but more than 65 days before the general election, the political party "shall summarily certify" a candidate for the general election ballot).

[56] *Id.* § 20A-1-508(6) (when a vacancy arises less than 65 days before general election, the political party of the prior office holder may submit an individual to serve the unexpired term).

[57] *Id.* § 20A-1-508(5).

A.C.J. Nehring, opinion of the Court except Part II

## VI. THE CROSS-PETITION FOR EXTRAORDINARY RELIEF IS DENIED AS PROCEDURALLY IMPROPER

¶ 47  The Voters also submitted a third-party cross-petition for extraordinary relief, requesting this court to order that both candidates be placed on the November general election ballot. We deny the cross-petition as an improper means of petitioning this court.  As noted above, a petition for extraordinary writ is appropriate only when "no other plain, speedy and adequate remedy is available."[58]  When the petitioner is a party to the action below and seeks alternate relief from the district court order, there is an adequate remedy available—namely, an appeal. Thus, "[b]efore we can address a petition for extraordinary relief, the petitioning party must have exhaust[ed] all available avenues of appeal."[59]  The purpose of this rule is to "keep litigants from bypassing traditional avenues for judicial relief, or in other words from substituting the extraordinary writ process for what should have been ordinary litigation."[60]

¶ 48  Cross-petitioners were all parties to the action below.  As such, they possessed a right of appeal from the district court order.  Should they seek relief contrary to that order, the appropriate means is through an appeal, not through an extraordinary writ to this court.[61]  The cross-petition is therefore denied.

---

[58] Utah R. Civ. P. 65B(a).

[59] *Friends of Great Salt Lake v. Utah Dep't of Natural Res.*, 2010 UT 20, ¶ 23, 230 P.3d 1014 (second alteration in original) (internal quotation marks omitted); *accord Krejci v. City of Saratoga Springs*, 2013 UT 74, ¶ 10, 322 P.3d 662 ("[W]here a petitioner had an opportunity to file an appeal but failed to do so, it cannot use an extraordinary writ to gain a second shot at an appeal.").

[60] *Krejci*, 2013 UT 74, ¶ 10.

[61] *See Friends of Great Salt Lake*, 2010 UT 20, ¶ 23 ("[T]he opportunity to appeal . . . constitutes a plain, speedy and adequate remedy[;] . . . an extraordinary writ is not a proceeding for general review." (internal quotation marks omitted)).

JUSTICE LEE, opinion of the Court in Part II

**CONCLUSION**

¶ 49 We grant the petition because the lieutenant governor could not appeal the district court's decision and did not have another plain, speedy, and adequate remedy. We uphold the district court order to annul and set aside the election. But we determine that the court exceeded its statutory authority when it ordered the county to hold a new election, and we therefore vacate that part of the order. Instead, by looking to analogous provisions within the election code, we determine that the legislature did not intend for the party candidacy to sit vacant before the general election. Thus, we ordered the candidacy to be filled in accordance with the procedures found in Utah Code section 20A-1-501. Finally, we deny the Voters' cross-petition as procedurally improper.

---------

JUSTICE LEE, opinion of the Court in part:

¶ 50 I concur in the judgment of the court but write separately to identify some points of disagreement with elements of the court's analysis. For reasons explained below, I would not affirm the *merits* of the district court's decision annulling and setting aside the election in question under Utah Code section 20A-4-404(4)(c). *See supra* ¶ 25. Yet I would nonetheless affirm the decision in question in light of Utah Code section 20A-4-406(2), which "void[s]" a certificate of election in a case (like this one) where "an election is annulled or set aside by the judgment of a court and no appeal is taken within 10 days." And finally, instead of presuming knowledge of the "legislature's intent" on a subject not addressed expressly in the code, *supra* ¶ 41, I would employ the doctrine of absurdity to deem the relevant statute, Utah Code section 20A-1-501(1)(a), to be triggered by the statutory directive "void[ing]" the primary election certificate.

I. PLEADING AND PROOF IN AN
ELECTION CONTEST

¶ 51 First, I disagree with the court's conclusion that an election contest can be sustained "even if the contested votes cannot ultimately be counted, as when ballots are lost or destroyed." *Supra* ¶ 33. Under the governing statutory provisions

as I understand them, it is the election contest petitioner's burden to plead and prove that any "illegal votes" that were cast would have made a difference in the election. *See* UTAH CODE § 20A-4-403(2)(c); *id.* § 20A-4-404(3), (4). And in light of that burden, I would conclude that any uncertainty in contested ballots that "cannot ultimately be counted" should be resolved against the election contest petitioner.

¶ 52 That premise seems embedded in the operative terms of the code. The code lists two categories of election contest claims: (a) those in which the election contest petitioner must establish that there were errors (in fraud, corruption, illegal votes counted, legal votes not counted, etc.) "sufficient to change the result" of the election[62] and (b) those that do not implicate the result of the election, as where the person declared elected was ineligible for office.[63] The implication is clear. For the former category of

---

[62] UTAH CODE § 20A-4-402(1)(a) ("for malconduct, fraud, or corruption on the part of the judges of election . . . sufficient to change the result"); *id.* § 20A-4-402(1)(d) ("when illegal votes have been received or legal votes have been rejected at the polls sufficient to change the result"); *id.* § 20A-4-402(1)(e) ("for any error of any board of canvassers or judges of election in counting the votes or declaring the result of the election, if the error would change the result"); *id.* § 20A-4-402(1)(f) ("when the election result would change because a sufficient number of ballots containing uncorrected errors or omissions have been received at the polls"); *id.* § 20A-4-402(1)(h) ("when an election judge or clerk was a party to malconduct, fraud, or corruption sufficient to change the result of the election"); *id.* § 20A-4-402(1)(i) ("for any other cause that shows that another person was legally elected").

[63] *Id.* § 20A-4-402(1)(b) ("when the person declared elected was not eligible for the office at the time of the election"); *id.* § 20A-4-402(1)(c) ("when the person declared elected has: (i) given or offered to any registered voter, judge, or canvasser of the election any bribe or reward in money, property, or anything of value for the purpose of influencing the election; or (ii) committed any other offense against the elective franchise"); *id.* § 20A-4-402(1)(g) ("when the candidate declared elected is ineligible to serve in the office to which the candidate was elected").

election contest claims (including claims asserting that "illegal votes have been received or legal votes have been rejected at the polls"), the statute contemplates a showing of an impact "sufficient to change the result" of the election. *Id.* § 20A-4-402(1)(d).

¶ 53 The pleading provisions of the code reinforce this conclusion. To assert a "cause of contest" in a case in which "the reception of illegal votes" is the basis for challenging a primary election, a petitioner must "state generally that . . . illegal votes were given to a person whose election is contested, which, if taken from him, would reduce the number of his legal votes below the number of legal votes given to some other person for the same office." *Id.* § 20A-4-403(2)(c)(i). Alternatively, where the contest involves "legal votes" that were "rejected," a petitioner must allege that "legal votes for another person were rejected, which, if counted, would raise the number of legal votes for that person above the number of legal votes cast for the person whose election is contested." *Id.* § 20A-4-403(2)(c)(ii). Thus, even at the pleading stage, the petitioner's burden is more than just to identify a number of votes that would be sufficient to alter the outcome of the election if all of the ballots in question were assumed to have been cast for the "other person." Instead, as to illegal votes, the election contest petitioner must allege that "illegal votes were given to a person whose election is contested" in a number that is sufficient to "reduce the number of his legal votes below the number of legal votes given to some other person for the same office." *Id.* § 20A-4-403(2)(c)(i). And, as to rejected legal votes, the election contest petition must allege that such votes "for another person were rejected," and that such votes "if counted, would raise the number of legal votes for that person above the number of legal votes cast for the person whose election is contested." UTAH CODE § 20A-4-403(2)(c)(ii).

¶ 54 The election contest petitioner must accordingly do more than "challenge[] enough votes to meet or exceed the margin of victory." *Supra* ¶ 27. He must instead make allegations that go to the actual impact of alleged illegal votes on the outcome of the election—as to illegal votes "given to a person whose election is contested" that would "reduce the number of his legal votes below the number of legal votes given" to the petitioning candidate, or as to rejected legal votes "for" the petitioning candidate that "would raise the number of legal votes for that

person" above those cast for the person whose election is contested. *Id*. § 20A-4-403(2)(c).

¶ 55  To me, this makes sense as a legal and logical matter. I see no basis in law or logic to *assume* that all illegal ballots in question (or rejected legal ballots) *would have been cast* in favor of the candidate filing the election petition. And the contrary presumption (in favor of the candidate whose election is contested) is premised rather straightforwardly in the burden of proof that the law has long assigned to a plaintiff or petitioner. Indeed, resolution of matters unresolved by the evidence is a core function of the burden of proof. One reason we assign a burden of persuasion is as a tie-breaker—to give the benefit of the doubt to the status quo, and to require the plaintiff or petitioner to rebut the status quo with evidence.[64] The pleading provisions of the election code appear to me to affirm this burden, by requiring an election contest petitioner to do more than just identify "enough votes to meet or exceed the margin of victory." *Supra* ¶ 27.

¶ 56  The evidentiary standards in the code seem to me to further undermine the majority's approach. Under subsection 403(2)(d),

> The court may not take or receive evidence of any the votes described in Subsection (2)(c), unless the party contesting the election delivers to the opposite party, at least three days before the trial, a written

---

[64] *See, e.g.*, 21B CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE & PROCEDURE: EVIDENCE § 5122, at 394 (2d ed. 2005) (explaining the policy underlying the burden of proof by noting that "[u]nder the American system," judges do not "roam about the countryside like the Lone Ranger seeking wrongs to right," rather a party brings a dispute to the judge and if that party were to "demand satisfaction from another, yet refuse to provide any information about the dispute," the judge will not require the information of the opposing party because "the opponent is not asking any favors of the court," the judge will "refuse[] to give the claimant the relief demanded where he has failed to bring evidence to support his claim").

list of the number of contested votes and by whom the contested votes were given or offered, which he intends to prove at trial.

Utah Code § 20A-4-403(2)(d)(i). In addition, the same provision clarifies that "[t]he court may not take or receive any evidence of contested votes except those that are specified in that list." *Id.* § 20A-4-403(2)(d)(ii). The focus here and elsewhere is on "evidence of contested votes," and on "prov[ing]" those votes "at trial." This runs counter to the idea of *presuming* that contested votes would have been cast in favor of the petitioner (and against the person whose election is contested). Clearly, the code contemplates proof of the illegal votes, and by evidence presented at trial.

¶ 57   Final confirmation of this conclusion appears in section 404. That section prescribes the procedures governing the court in an actual election contest proceeding under the election code. It indicates that the "court shall meet at the time and place designated to *determine the contest*," and, when "necessary for the court to inspect the ballots of any voting precinct in order to determine any election contest," it directs the court to "*open and inspect the ballots* in open court in the presence of the parties or their attorneys." *Id.* § 20A-4-404(2)–(3) (emphases added). Two points stand out in these provisions. One is that the court is to "determine the contest." The other is that that determination is to be made by "open[ing] and inspect[ing] the ballots in open court." This strikes me as incompatible with the majority's notion of a presumption in favor of the petitioner. Far from assuming that "eight illegal votes in a five-vote-margin election [are] enough to warrant setting aside the election results," *supra* ¶ 35, the code directs the court to consider the evidence before it to decide whether the illegal votes are sufficient to change the results of the election. And the code indicates the manner in which that evidence is to be considered—by inspection of the ballots in question, again to determine the proper resolution of the contest in question.

¶ 58   It is no answer, in my view, to assert that in this case "the contested votes cannot ultimately be counted." *Supra* ¶ 33. That proposition was adopted by the district court and endorsed by the parties in the case before us on this petition for extraordinary writ. *See* Mem. Decision 11–12 (concluding that the court's "choices are limited" because the court could not

"determine who received the highest number of legal votes"); Mem. Resp. & Opp. to Pet. 3 (noting that "because of how the contested ballots had been handled—co-mingled with all the other absentee ballots . . . — it would not be possible to identify and find those ballots to determine how they had been cast"). The premise, as far as I can tell, is that the contested ballots were comingled with other ballots, in a manner rendering it impossible for the district court to "open and inspect the ballots in open court" in the course of "determin[ing] the contest." *See* Mem. Resp. & Opp. to Pet. 3. I have no basis for questioning that conclusion.[65] But it is in my view beside the point under the statute. Apparently, the legislature contemplated a proceeding in which a petitioner in an election contest would present contested ballots to the district court for inspection and an ultimate resolution of the contest. If for some reason that evidence was

---

[65] In the course of briefing and oral argument, the suggestion was made that the proof problem in this case was not the product of comingling of ballots but instead a systemic issue embedded in our electronic voting system. The point, specifically, was that it is technically impossible to "inspect" a contested (allegedly illegal) ballot in court to determine which way the ballot was cast on the office in question. *See* Oral Arg. 9:00–17:00; *but see* Mem. Decision 9–10 (noting that *by statute* for either a paper or electronic ballot "[t]he poll worker should have written [Russell C. Jones's] ballot number and the name of the Republican party opposite Mr. Jones's name in the official register," that for a paper ballot the poll worker should have "endorsed Mr. Jones's initials on the [ballot] stub"). I have no way of knowing whether that is in fact the case. But if it is, this is a problem that the legislature, the lieutenant governor, and other election officials ought to be aware of. If there is a disconnect between the governing election contest provisions of our code and the voting system we are currently employing, one or the other of them ought to be altered. If our current voting system in fact makes it impossible to inspect a challenged ballot, our system should be altered to facilitate the required determination by the court. Or, alternatively, our election contest provisions should be amended to bring them in line with our current voting system.

unavailable in this case, there is an established mechanism for resolving a case in which evidence is missing—the burden of proof. And because the election contest petitioner (Dyer) bore the burden, I do not see how we can affirm a decision annulling and setting aside the election on his election contest petition absent the evidence and proof contemplated by the statute.[66]

¶ 59  By statute, the district court has authority to "annul[] and set[] aside the election." UTAH CODE § 20A-4-404(4)(c)(i). But that authority is to be exercised in connection with the court's determination of the election contest, and upon inspection of the contested ballots "in open court." *Id.* § 20A-4-404(3)(b)(i). Indeed, as if to emphasize this point, the code specifies that the district court's authority to enter a judgment "annulling and setting aside the election" is to be exercised only "[a]fter all the evidence in the contest is submitted." *Id.* § 20A-4-404(4)(c)(i).[67] Because the district court did not determine the election contest in this case on the basis of the evidence specified by the code, and the election contest petitioner (Dyer) did not carry his burden of persuasion under the statute, I would not affirm the district court's decision on the merits. And I would not conclude that an election contest

---

[66] In so concluding, I would render neither judgment nor "suspicion" as to the "types of circumstantial evidence" that "could properly be relied upon to determine the outcome of an election." *Supra* ¶ 27 n. 32 ("express[ing] great suspicion" that voter testimony could be considered in an election contest).

[67] Presumably, the usual circumstance in which an election contest would be annulled and set aside *without* declaring another person the rightful winner would be the circumstances spelled out in the statute in which there is no showing required as to the impact on the "result" of the election. *See supra* ¶ 52 n.66; UTAH CODE § 20A-4-402(1)(b), (c), (g). This case is another—more unusual—example. As explained below, the lack of an appeal from the judge's order annulling and setting aside the election in this case "void[ed]" the certificate of election by statute. UTAH CODE § 20A-4-406(2). Ordinarily, however, an election contest premised on an allegation of illegal votes being counted and/or legal votes not being counted would require proof that the votes in question were "sufficient to change the result." *Id.* § 20A-4-402(1)(d).

petitioner may succeed in overturning an election without carrying his burden of proof.

## II. LACK OF AN APPEAL AS VOIDING A CERTIFICATE OF PRIMARY ELECTION

¶ 60 For the above reasons, I disagree with the grounds for the court's decision to affirm the district court's decision annulling and setting aside the election in question on its merits. Yet I would still affirm the decision of the district court on the basis of a procedural bar in the election code. On this point, moreover, a majority of the court agrees.

¶ 61 Under Utah Code section 20A-4-406(2), "[w]henever an election is annulled or set aside by the judgment of a court and no appeal is taken within 10 days, the certificate of election, if any has been issued, is void, and the office is vacant." The conditions of this provision have been satisfied in this case. Judge Laycock entered an order annulling and setting aside the election in question on August 14, 2014. That judgment became unassailable when no appeal was taken by the parties within ten days—on or before August 24, 2014. At that point, the "certificate of election" in question became "void" by statute. I would affirm Judge Laycock's order annulling and setting aside the election in this case on that basis. And in so doing, I would stop short of reaching the pleading and proof problems discussed in Part I of this opinion above.

¶ 62 For these reasons, and for others set forth in the majority opinion of Associate Chief Justice Nehring, *supra* ¶¶ 36–39, I would also hold that the district court erred in ordering a special election. As Justice Nehring indicates, the election code nowhere empowers the court to order a special election. And a decision ordering government officials to conduct such an election without affording them notice and an opportunity to be heard would fail as a matter of procedural due process. [68] In any event, the impact

---

[68] Under the governing civil rule, a party to an injunction is entitled to notice and an opportunity to be heard. UTAH R. CIV. P. 65A(a)(1) ("No preliminary injunction shall be issued without notice to the adverse party."); *id*. 65A(d) (providing that an injunction "shall be binding only upon the parties to the action,

(con't.)

of the lack of an appeal is clear: The "certificate of election . . . is void, and the office is vacant." Utah Code § 20A-4-406(2). That remedy affords no room for a special election.

¶ 63 Justice Nehring arrives at the same ultimate conclusion—affirming the decision setting aside the election but reversing the decision ordering a special election. But he rests his decision on the merits of the underlying election contest, while deeming section 406(2) inapplicable. The proffered grounds for avoiding section 406(2), however, misunderstand my basis for invoking this provision, and provide no basis for ignoring its terms.

¶ 64 I have no quarrel with the proposition that the lieutenant governor acted with "diligence" in submitting his petition for extraordinary writ. *Supra* ¶ 24. Thus, I am on board with the conclusion that the petition was timely (and not barred by the doctrine of laches), and agree that we should "reach the merits" of the lieutenant governor's claims. *Supra* ¶ 24. My point is simply that in addressing the merits, we should give effect to the governing provisions of the election code, including Utah Code section 20A-4-406(2).

¶ 65 I am not suggesting that this provision "insulate[s]" the district court's decision "from review." *Supra* ¶ 23. Instead, I would simply hold that in exercising our extraordinary writ power, we are no less bound to follow the law. A petition for extraordinary relief invokes this court's "original jurisdiction." *See* Utah Const. art VIII § 3. Such a petition is simply an alternative procedural pathway for a party to ask this court to exercise its judicial power. But whether we are exercising original or

their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive notice"). That rule, moreover, is an outgrowth of the constitutional right to due process. *See* 11A Charles Alan Wright & Arthur Miller, Federal Practice & Procedure § 2956 at 383–84 (3d ed. 2013) ("A court ordinarily does not have power to issue an order against a person who is not a party and over whom it has not acquired in personam jurisdiction. Therefore, persons who are not actual parties to the action or in privity with any parties may not be brought within the effect of a decree merely by naming them in the order." (footnote omitted)).

appellate jurisdiction, we are always bound to follow the law. And here that law includes section 406(2).

¶ 66 Section 406(2) is simple and straightforward. It provides a "brief ten-day window for the parties to appeal an election decision," *supra* ¶ 23, and expressly indicates that the election certificate is "void" where there is no appeal, UTAH CODE § 20A-4-406(2). That provision sustains significant reliance interests; and those interests ought to be protected in the exercise of our original jurisdiction. I would affirm on the basis of section 406(2), which clearly dictates affirmance of the district court's decision.

### III. THE DOCTRINE OF ABSURDITY

¶ 67 When a certificate of election becomes "void" under Utah Code section 20A-4-406, the statute also dictates the conclusion that "the office is vacant." A vacancy in an office, in turn, is addressed by the terms of Title 20A, Chapter 1, Part 5 of the code. In the event of a "midterm vacancy" in a county office, for example, the code provides for appointment of an "interim replacement" by the "county legislative body" and the subsequent election of a "replacement" by terms and conditions specified for a special election. UTAH CODE § 20A-1-508. This part of the code also speaks to a different sort of "vacancy"—a candidate *vacancy*. For a "registered political party that will have a candidate on a ballot in a primary election," the code specifies procedures for the party to replace a candidate who "dies," "resigns" due to a "disability," or "is disqualified by an election officer for improper filing or nominating procedures." *Id.* § 20A-1-501(1)(a). Specifically, this section of the code indicates that a "candidate vacancy" in a county office is to be filled by "the county central committee of a political party." *Id.* § 20A-1-501(1).

¶ 68 As the majority indicates, this provision is not technically implicated in this case. *Supra* ¶ 43. By its terms, this section does not apply because this is not a case in which there is a "candidate vacancy" precipitated by death, resignation due to disability, or disqualification by an election officer for filing or nomination violations.

¶ 69 The question presented, accordingly, is how to deal with what appears to be a gap in the code. One possible approach, and the one that would be the ordinary course for a court, is for us to stand down—to do nothing, and treat the gap as one for the

legislature (and not this court) to fill going forward. This is the ordinary course because it respects the work product of the legislature—the statutory text. In most all cases, it is not the court's job to fill in the gaps it finds in legislation. That is most always a legislative function, and thus not one for us.

¶ 70  With this in mind, I disagree with the line of cases cited approvingly in the majority opinion. *See supra* ¶ 42 n.51. I would not conclude, as these courts seem to, that "when a statute is silent" on a particular issue, it is our role to fill in the gap with our best sense of the legislature's "intent" on the omitted matter. *Supra* ¶ 42 n.51 (citing cases). Instead of imagining the legislature's intent in such circumstances, in an effort to "'determine the best rule of law to ensure that the statute is applied uniformly,'" *supra* ¶ 42 n.51 (quoting *Mariemont Corp. v. White City Water Improvement Dist.*, 958 P.2d 222, 226 (Utah 1998)), we should generally treat the omitted case as simply *omitted* from the legislation.[69]

¶ 71  Yet there is a narrow, limited exception to this rule. The exception is the doctrine of *absurdity*, under which we may find the text of a statute to encompass a term or condition not expressly provided by the legislature. This is strong medicine, not to be administered lightly. To respect the separation of powers and the constitutional prerogatives of the legislature, we must not substitute our views of good policy for that of the legislature. Instead, we should deem ourselves bound to follow and implement only the terms and conditions of the code *except* in the

---

[69] *See Iselin v. United States*, 270 U.S. 245, 251 (1926) (Brandeis, J.) ("To supply omissions transcends the judicial function."); *Jones v. Smart*, (1785) 99 Eng. Rep. 963 (K.B.) 967 (Buller, J.) ("[W]e are bound to take the act of parliament, as they have made it: a *casus omissus* can in no case be supplied by a Court of Law, for that would be to make laws . . . ."); Frank H. Easterbrook, *Statutes' Domains*, 50 U. Chi. L. Rev. 533, 548 (1983) ("Judicial interpolation of legislative gaps would be questionable even if judges could ascertain with certainty how the legislature would have acted. Every legislative body's power is limited by a number of checks . . . . The foremost of these checks is time. . . . The unaddressed problem is handled by a new legislature with new instructions from the voters.").

rare and limited circumstance in which the terms as written would lead to an outright *absurdity*.

¶ 72 The doctrine of absurdity is both deeply rooted and narrowly restricted. It traces its roots at least to Blackstone, who asserted that "where words bear . . . a *very absurd* signification, if literally understood, we must *a little deviate* from the received sense of them." 1 WILLIAM BLACKSTONE, COMMENTARIES *60 (emphases added). The emphasized terms in Blackstone's formulation highlight two points of limitation. One is the degree of absurdity. If we are to maintain respect for the legislature's policymaking role, and avoid the temptation to substitute our preferences for its decisions, we must not override the statutory text with our sense of good policy in a case in which we deem the statute's formulation merely unwise or incongruous. To justify this extraordinary exercise of judicial power, the text as written must be so overwhelmingly absurd that no rational legislator could ever be deemed to have supported a literal application of its text.[70]

---

[70] *See* 1 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 427, at 411 (1833) ("[I]f, in any case, the plain meaning of a provision, not contradicted by any other provision of the same instrument, is to be disregarded, because we believe the framers of that instrument could not intend what they say, it must be one, where the absurdity and injustice of applying the provision to the case would be so monstrous, that all mankind would, without hesitation, unite in rejecting the application."). The Story formulation may contain a bit of hyperbole. In the divided society we live in today, I rather doubt there are any points of statutory interpretation on which "all mankind" would "unite" "without hesitation." For me, the better formulation is one that would ask whether any rational legislator could have adopted the formulation rendered by the literal text. *See Hanif v. Att'y Gen.*, 694 F.3d 479, 483 (3d Cir. 2012) (invoking the doctrine of absurdity upon a showing that "blind adherence to the literal meaning of a statute [would] lead to a patently absurd result that no rational legislature could have intended"); *Cernauskas v. Fletcher*, 201 S.W.2d 999, 1000 (Ark. 1947) (refusing to read literally a provision which read "[a]ll laws and parts of laws, and

(con't.)

Justice Lee, opinion of the Court in Part II

¶ 73   Some examples from modern cases may help to illustrate the standard. In 1995, a Texas statute provided an absolute defense to all "Chapter 601 offenses" under the Texas code where the accused "produce[d] in court a motor vehicle liability policy . . . that was valid at the time the offense is alleged to have occurred."[71] Read literally, this provision would have provided not just a defense for the "Chapter 601 offense" of driving without proof of insurance, but absolute immunity (by production of proof of insurance) for other "Chapter 601 offenses" such as driving on a suspended license. In *State v. Boone*, 1998 WL 344931 (Tex. Ct. App. June 30, 1998) (unpublished), the court avoided this absurd result. It did so by limiting "Chapter 601 offense" to the offense of driving without proof of insurance. *Id.* at *2–*3. Rightly so, as no rational legislator could be deemed to have supported the statutory text as written literally.[72]

¶ 74   The second limitation in Blackstone's formulation is also important. It authorizes "little" or minor deviations from the statutory text to avoid absurdities in statutory meaning. As to larger deviations, the premise is that it is more likely that a judicial override of literal statutory text may represent a mere policy disagreement, and not a correction of an unintended (and obvious) disconnect between the policy adopted by the legislature and the text it used to implement it. To minimize the risk of judicial overreach, the absurdity doctrine should be limited to cases in which there is a "non-absurd reading that could be achieved by modifying the enacted text in relatively simple ways."[73] The above-cited Texas case is a good example. Because it

---

particularly Act 311 of the Acts of 1941, are hereby repealed" because "[n]o doubt the legislature meant to repeal all laws in conflict with that act, and, by error of the author or the typist, left out the usual words 'in conflict herewith,' which we will imply by necessary construction").

[71] Tex. Transp. Code Ann. § 601.193(a) (West 1995).

[72] *See also Cernauskus*, 201 S.W.2d at 1000 (refusing to read literally a statute which purported to wipe out all statutory law in the state of Arkansas because such a result was an absurdity).

[73] Michael S. Fried, *A Theory of Scrivener's Error*, 52 Rutgers L. Rev. 589, 607 (2000); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 239 (2012)

(con't.)

was "relatively simple" to read a limitation on "Chapter 601 offenses," the Texas court was able to avoid an obvious absurdity in a manner consistent with the Blackstone limitations on the doctrine.

¶ 75 I would reach the same conclusion as the majority by application of these tenets of the doctrine of absurdity. For reasons explained by the court, it is impossible for me to imagine that any rational legislator would have supported a literal construction of the election code—a construction leading to the determination that annulment of a primary election would leave a registered political party *without* a designated candidate in the general election. That outcome is literally absurd, and by no means the sort of outcome that any legislator could have intended as any sort of legislative compromise. That conclusion is particularly clear (as the majority notes) in light of other provisions of the code that comprehensively prescribe mechanisms for a party to designate a replacement candidate when the candidate designated in the primary is otherwise unavailable—due to death, resignation due to disability, or disqualification by an election officer for filing or nomination violations. *See supra* ¶¶ 44–45 (citing UTAH CODE § 20A-1-501). And the point is hammered home by another provision of the code, section 20A-5-508, which, as the majority explains, allows a political party to "summarily certify" a candidate for a general election when a vacancy arises within 75 days of a primary but more than 65 days before the general election. *Supra* ¶ 45 n.58 (citing UTAH CODE § 20A-1-508(5)). In light of these provisions, and for reasons explained in greater detail in the majority opinion, I would conclude that no rational legislator could have intended to leave a registered political party without a candidate on the ballot in a case in which the primary election is annulled and set aside.

¶ 76 I would also endorse the majority's adoption of the mechanism set forth in Utah Code section 20A-1-501(c)(iii) as the

("The doctrine of absurdity is meant to correct obviously *unintended* dispositions, not to revise purposeful dispositions that, in light of other provisions of the applicable code, make little if any sense.").

JUSTICE LEE, opinion of the Court in Part II

applicable provision in this case. That provision prescribes a procedure for a party to designate a substitute candidate where the candidate chosen in a primary has been disqualified by an election officer. That is not technically what happened here. But extension of that provision to this (closely analogous) case represents a "relatively simple" adjustment to the statutory language. And for that reason the court's adoption of this provision seems to me to be compatible with our limited authority under the narrow doctrine of absurdity as described above.

————————